**Marvin McCLAIN, Petitioner,**

v.

**UNITED STATES of America,
Respondent.**

**No. 79 Civ. 2438.**

United States District Court,
S. D. New York.

Nov. 23, 1981.

---

The Legal Aid Society Federal Defender Services Unit, New York City, for petitioner; Phylis Skloot Bamberger, New York City, of counsel.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City; for respondent; Benito Romano, Asst. U. S. Atty., New York City, of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

We undertake the resentencing of this defendant who interposed on October 14, 1975 a guilty plea to three counts based on his participation in an armed bank robbery during the course of which he shot a bank

guard. He was indicted for bank robbery, 18 U.S.C. § 2113(a) maximum penalty 20 years and/or $5,000 fine and armed bank robbery, 18 U.S.C. § 2113(d) maximum penalty 25 years and/or $10,000 fine. Subsequently another charge was added: the commission of a felony while armed, 18 U.S.C. § 924(c)(1) maximum penalty not less than 1 year nor more than 10 years.

On December 3, 1975 we imposed sentence. While the total maximum prison sentence was 35 years, we imposed a prison sentence of 25 years: 15 years on counts 1 and 2 (merged by law, *Prince v. United States*, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957)) and 10 years on count 3. We erred. *McClain v. United States*, 643 F.2d 911 (2d Cir. 1981). The United States Circuit Court of Appeals, Second Circuit, vacated the sentence imposed "and the matter is remanded to the district court for sentencing under section 2113(d) only." [1]

Before the superseding indictment was handed down, defendant was prepared to enter a guilty plea to the two counts of the indictment. He was disinclined to do so, however, when advised of the added charge which carried with it an additional maximum prison sentence of 10 years. After a conference with counsel on both sides and with the defendant present, we assured them that we would not impose a sentence longer than 25 years. It was then that the defendant entered a guilty plea to each of the three counts.

In its opinion our Circuit Court reasoned: If we vacate appellant's entire sentence and remand for sentencing on only the section 2113(d) charge, the district court

may or may not increase the fifteen-year sentence already imposed. If the District Court intends to consider the imposition of an increased sentence, it should afford an opportunity to have the propriety of such an increase briefed and argued; if such an increase is imposed, its propriety will of course be subject to consideration in this Court upon appeal. See *Busic v. United States, supra*, 446 U.S. [398] at 412 n.19, 100 S.Ct. [1747] at 1756 n.19, [64 L.Ed.2d 381].

We limit our decision on this appeal to holding that we may vacate appellant's entire sentence under the general supervisory powers granted us by 28 U.S.C. § 2106. See *Johnson v. United States*, 619 F.2d 366, 368–69 (5th Cir. 1980); *United States v. Moore*, 540 F.2d 1088, 1091 (D.C.Cir.1976); *Kitt v. United States*, 138 F.2d 842, 843 (4th Cir. 1943); *Phillips v. Biddle*, 15 F.2d 40, 41 (8th Cir. 1926).

*McClain, supra*, 643 F.2d at 913–14.

We carefully considered the imposition of an increased sentence, received and examined briefs and heard argument to the fullest extent. After a meticulous review of all the proceedings heretofore had herein and made a part of this disposition, and addressing ourselves exclusively to the sole criminal prohibition now before us (18 U.S.C. § 2113(d) maximum penalty 25 years and/or $10,000 fine), we have concluded that justice due the defendant and community alike makes it imperative that we impose a sentence of twenty years imprisonment. In doing so, we give "credit" (as promised) for the guilty plea,[2] and a further

---

1. McClain sought a writ of certiorari in the Supreme Court of the United States and pressed the issue: "... [W]hether a federal court of appeals may vacate and remand for resentence a judgment separate from another which has been challenged and appealed, when no procedural mechanism exists or is invoked to place the unchallenged judgment before the court." Petition for Writ of Certiorari, dated April 16, 1981, pp. 4–5. The Government contended: "In effect, the petition is interlocutory in nature because the district court has not yet resentenced petitioner. If, as petitioner suggests ..., the Section 2113 sentence is un-

changed following remand, petitioner will then be able to raise this and any other contentions in the court of appeals and in this Court as part of a single proceeding to review a final judgment. Accordingly, review by this Court of petitioner's claim is premature at the present time." Memorandum for the United States in Opposition, dated May, 1981, p. 3. On June 3, 1981 certiorari was denied without comment, —— U.S. ——, 101 S.Ct. 3057, 69 L.Ed.2d 424.

2. Our reasons therefor: Minutes of Oral Argument, October 1, 1981, pp. 26–30; we do not adopt the argument advanced in defendant's behalf.

reduction by reason of other factors we regard favorable to defendant.

We are only too well aware that the dilemmas of sentencing make it imperative that the judge proceed cautiously and thoroughly. The search is constant for the amount and kind of disciplinary action, in the light of the offender's moral standards and educability that will be needed to restore him to his place in the community with sound attitudes towards it. This court has had more than a nodding acquaintance with persons convicted of crime, the effects of different types of sentences imposed, the utilization of concepts of rehabilitation, the significance of cooperation with the Government, etc.[3]

■ Indispensable is a thorough search for all details having even the slightest bearing on a defendant's character, past and present. Often such an inquiry proves rewarding, for it supplies insights into strengths and weaknesses not theretofore revealed and furnishes enlightenment as to how best to write the sentence prescription. This approach is imperative and has long been encouraged and approved. In the exercise of his discretion, the judge may

> consider information about the convicted person's past life, health, habits, conduct, and mental and moral propensities .... Highly relevant—if not essential— to his selection of an appropriate sentence is the *possession of the fullest information possible* concerning the defendant's life and characteristics .... [The] modern philosophy of penology ... [emphasizes] that the punishment should fit the offender and not merely the crime.

*Williams v. New York*, 337 U.S. 241, 245–47, 69 S.Ct. 1079, 1082–83, 93 L.Ed. 1337 (1949) (emphasis supplied). *See also* 21 U.S.C. § 850.

■ Indispensable also is a thorough search for solid evidence pointing to the innate potential of offenders for moral rehabilitation and to determine just what it will require for them to establish and main-

tain themselves along lines heretofore foreign to them and inimical to their way of life.

It must be recognized that

> Much harm is done by the myth that, merely by putting on a black robe and taking the oath of office as a judge, a man ceases to be human and strips himself of all predilections, becomes a passionless thinking machine.... We are born with predispositions.... Only death yields complete dispassionateness, for such dispassionateness signifies utter indifference.... Impartiality is not gullibility. Disinterestedness does not mean child-like innocence.

*In re Linahan, Inc.*, 138 F.2d 650, 651–54 (2d Cir. 1943) (Frank, C. J.).

Indeed, in the pursuit of our judicial mission, hardly a day passes without the forceful reminder by Mr. Justice Holmes (*The Common Law* p.1) that "The life of the law has not been logic: it has been experience."

We are compelled to conclude that this defendant has been a determined offender against community well-being.

### The bank robbery

According to official data reflected in the pre-sentence report and obtained from the office of the U.S. Attorney and a Special Agent of the FBI, the defendant and one LeRoy McClain (believed not to be related to defendant) on June 23, 1975 at approximately 2:55 P.M. entered the Chase Manhattan Bank at 162 Third Avenue, in the Borough of Manhattan, City of New York. The defendant held a pistol at the head of the bank guard, Seymour Frankel (Frankel). A struggle ensued between the two; McClain fired several shots three of which entered Frankel's neck and chest.

The defendant then directed LeRoy McClain, who also brandished a revolver, to "Get the money." The latter vaulted the bank counter, collected and placed the money ($5,493) in a leather bag they had

---

**3.** See, e.g., *United States v. Butz*, 517 F.Supp. 1167 (S.D.N.Y.1981); *United States v. Ochs*, 490 F.Supp. 1206 (S.D.N.Y.), *aff'd*, 636 F.2d 1205 (2d Cir. 1980); *United States v. Unterman*, 422 F.Supp. 228 (S.D.N.Y.1976).

brought with them. The third accomplice, Mildred Skeete who had remained outside the bank, entered when the shooting occurred; she was handed the bag containing the bank's money; the three then fled.

The defendant and Skeete were arrested by FBI agents on July 3, 1975. She pleaded guilty to 18 U.S.C. § 2113(a) and (d); we sentenced her to six (6) years on December 3, 1975. LeRoy McClain was later apprehended, convicted and sentenced (15 years on December 7, 1976) by Judge Palmieri of this Court.

The bullets rendered Frankel unconscious; his physical condition was critical and to such an extent that he became a quadraplegic; at the Rusk Institute, his serious condition was emphasized by the sad comment: "Just a vegetable!" After we imposed sentence, we were officially informed that Frankel at age 45 died on March 16, 1977 "while hospitalized for the injuries which he sustained at the hands of the defendant." [4]

At sentencing defendant's counsel advanced the theory that "McClain was shot by the bank guard's gun, and the only question then is when it was done, and he [McClain] believes it was done before he pulled the trigger." [5] The Government promptly responded: "Your Honour, the testimony at trial would have shown that there was a tussle, and the two witnesses who actually saw the shooting would have testified that during the course of the tussle McClain's gun shot, and there is no indication that the guard's gun was shot."

We then commented: "The long and short of it is that you put a bullet into a guard's body, and that bank guard remains and will for the rest of his days be a paraplegic. You crippled a man for life. You say that someone shot at you. We have checked that all out. There is nothing along that line that supports what you maintain. That the drugs that you were taking might have robbed you of what a normal man would have possessed at that moment in the sense that you didn't respond because of the impact of drugs, that was your choice . . . . I was concerned about what happened inside the bank once your client entered it, and I wrote the Government a letter asking for a detailed examination. I studied the report. I made such inquiry as I thought I should, and I am satisfied that my pronouncement with regard to what he did is so, and I reject as unsupported the contention that you advance. I am entirely dissatisfied with it. It was that kind of thing that prompted me to want to be informed one way or the other as to what there was to it. Because it does make a difference . . . as to the amount of time or imprisonment imposed." [6]

We regard it significant that from the date of the proceedings at sentence (December 3, 1975) up to the very present not a single word has been said or written by defendant or in his behalf with respect to the circumstances surrounding the shooting of Frankel.

Afforded an opportunity to address the Court before sentence was imposed, the defendant had this to say: " . . . you asked me do I have anything to say. Of course. How much difference it would make, it's what your Honour thinks that matters. I would like to be transferred from MCC as soon as possible. I would also ask that your Honour consider granting me an A–2 number upon sentence. I state at this time defendant Skeets' part was more concern for me, therefore I ask that your Honour be more lenient with her. Any consideration given her will be most appreciated. Respectfully, McClain." [7]

When McClain on October 14, 1975 entered his plea of guilty to each of the three counts, we commented:

THE COURT: All right. I told your lawyer that I would not sentence you to

---

4. Report of U.S. Probation Officer, September 18, 1981.

5. Sentencing minutes, December 3, 1975, p. 11.

6. *Id.* at pp. 8–9, 12–13.

7. *Id.* at pp. 6–7.

the maximum of 35 years, that I would not exceed 25 years unless I saw good reason.

Over and above what was revealed to me up to this moment, if I should decide on the basis of reading a report about you from the Probation Department that the amount of sentence should exceed 25 years, I will allow you to withdraw your plea of guilty and send you to trial before another judge.

Before we pronounced sentence, we observed also:

THE COURT: ... I will be glad to tell you the factors and the only factors that I am considering with regard to the defendant as a human being, aside from the act [with] which we must deal. You know he pled guilty to each of three counts.... He is thirty-four. You know his prior criminal record. He was even a delinquent child. He got kicked around when he was growing up, and like a lot of children without the benefit of guidance he got himself into drugs and was held to account.

On one occasion he resisted arrest and struck a New York City Police Officer about the eye, causing his injury which required hospital treatment. He violated parole twice. His school record is miserable.

Scholarship, behaviour, attendance poor; low I.Q. Addicted to heroin and cocaine. At the time of his arrest addicted to valium. $200 daily habit.

He enrolled in numerous drug rehabilitation programs, all to no avail. There is no record of employment. He has sustained himself by what we call street activities. Apparently of an illegitimate nature. And frankly he has no remorse. There is hardly a thing that I can pick up out of the record, and out of the wreckage of this man's life so far that he himself has created, that I can hold onto.

I think one of the biggest things to give him credit for is the fact that he followed his lawyer's advice and pled guilty, and for that I intend to give him substantial credit. That is the only thing I can grab hold of.[8]

\* \* \* \*

When interviewed by the court official who prepared the presentence report, the defendant stated: he planned the bank robbery a few weeks before he carried it out; he and LeRoy McClain carried guns and Skeete a handbag later used in the robbery; he threw his weapon into the Hudson River; he received only approximately $600 which he spent on drugs.

For her part, Skeete told the same court official: she went by subway to the bank; she knew the defendant was armed; she carried a black leather bag; she waited outside the bank until she heard the gun shots; she then entered the bank; LeRoy McClain, who she saw behind the teller's counter, called out to her to take the bag of money from him and she did so.

She further stated at the same interview: the three met later that day at Mt. Morris Park in New York City; the two men shared the money but did not give her any; she "helped to spend Marvin McClain's share."[9]

We would be remiss if we failed to include other comments on the day sentencing took place and prior to its imposition. With commendable frankness, counsel for the defense observed: "I don't think that Mr. McClain has ever really confided in me concerning things of a personal nature. He was completely honest about the nature of the offense from the outset from my first meeting with him when he was in the hospital. But I can appreciate the fact that there aren't a lot of positive things in the record for your Honour, and I know very well that your Honour looks for them, looks for things that can help you shake your head, 'yes' to try to find sympathetic and mitigating factors in his background.... I frankly, too, have not seen a great deal of remorse in him. He is not that open with me. He is calculating, and he is hesitant,

8. *Id.* at pp. 3–4.

9. Presentence Report, November 21, 1975, p. 3.

and I suppose that comes after all the years that he has been on the street making the only calculations that are required of a drug addict, essentially how do you eat and where do your next set of works and drugs come from." [10]

We then meted out this sentence: ". . . you understand that under the law counts 1 and 2 are merged. And so I can't sentence him on count 1 and another sentence on count 2, because they are merged. The Court, with regard to counts 1 and 2, which are merged, imposes fifteen years. On count 3, ten years. They are to run consecutively so that the Court fully intends by this sentence to impose twenty-five years as the period of confinement." [11]

After considerable reflection, it was our purpose to impose a sentence of 25 years. In accordance with proper practice at that time, we imposed a single general sentence on the merged counts and a consecutive term of 10 years under § 924(c). We could have, just as easily, sentenced petitioner to the maximum 25 years under § 2113(d), and without enlargement thereon, disposed of the other two counts. Certainly, the imperative element in the sentencing process is the substantive nature of the sentence meted out, not the form in which the sentence is imposed. Judge Friendly put it so very much better (*United States v. Ochs*, 595 F.2d 1247, 1262 (2d Cir. 1979)):

> We are not disposed to use this case to test the limits of our power with respect to sentences that are within legal limits and are not shown to have been based upon materially inaccurate information. Judge Cooper was dealing not with a man who had simply yielded to the temptation to cheat the Government of income taxes by claiming false exemptions but with an individual whose whole life from the age of 16 to his then age of 48 had shown a contemptuous disregard for law. After serving jail sentences and being released on parole, he repeatedly violated parole by committing new crimes. On the undisputed record disclosed in the pre-sentence report, the judge could reasonably have given Ochs an even higher total sentence than he did. Particularly in light of our disposition of the suppression claim, *we are not concerned with how the sentence was structured.* (emphasis added)

### Who is this defendant?

a. Early years

McClain was born on October 4, 1941 in New York City. From the official presentence investigation we learn he was raised by his mother and maternal grandmother, his father apparently playing no part in rearing him. McClain lived with his mother and grandmother until the age of thirteen when he was committed to Children's Village—his second adjudication as a delinquent child. Little has been revealed to us concerning McClain's life while he was at Children's Village. He married on October 8, 1960; at first they resided in the Bronx, New York for ten years, moving to Manhattan in 1970. The marriage was dissolved by a divorce decree in 1972 on the ground of McClain's desertion. One child of the union, a son, was placed in the custody of the mother.

After the divorce McClain became involved in a "consensual" relationship with Mildred Skeete (his co-defendant) who supported herself in part by prostitution. The two lived in a series of New York City hotels, having no permanent place of residence during the three years prior to the bank robbery.

McClain's employment background mirrors the other aspects of his life—nothing of a positive nature can be said. Prior to 1961, McClain held a series of jobs for short periods of time, usually as messenger or shipping clerk. His means of support after 1961 and while incarcerated for the numerous crimes he had committed, came from various " 'street activities' ", which he did

---

10. Sentencing minutes, December 3, 1975, pp. 4, 5.

11. *Id.* at p. 13.

not specify to the official preparing the presentence report.[12]

Both of McClain's parents are dead. He reportedly remains close to an aunt and a half-sister. Both were interviewed by our probation department and "expressed a willingness" to help the defendant, but questioned their resources and influence over him.

\*     \*     \*     \*

Perhaps the only positive note regarding McClain's personal and family background comes from an unsolicited letter we received on August 25, 1981 from his cousin, the Reverend James McClain. We read it into the record during the course of the oral argument by counsel on October 1, 1981.[13] On that occasion the defendant expressed his confidence in, and high regard for, his cousin.[14] We directed that Reverend McClain be interviewed by our probation department. The result was favorable, indeed.[15] Perhaps the defendant's cousin might help him while confined. We intend to take steps to bring that to pass.[16]

\*     \*     \*     \*

McClain's educational background can best be described as minimal. He commenced his education in 1946 at a public school in New York City. In October, 1954, at the age of thirteen, McClain left the public school system, having been committed to Children's Village by the Manhattan Children's Court.[17] His school education was completed at the end of the eighth grade. The records of McClain's school performance indicate his scholarship, attendance and behavior were poor. The only positive fact regarding his school years is garnered from a personality evaluation: McClain was "considered courteous, but lacking in effort." [18]

### b. Defendant's criminal record

McClain's prior criminal record as it stood before the instant offense reveals that both as a juvenile and as an adult he has been arrested for and convicted of several crimes ranging from larceny to felonious possession of narcotic drugs.[19] McClain's first recorded encounter with the police authorities, at the age of 11, occurred on May 22, 1953 when he was arrested for stealing $14 from a teacher in New York City and

---

**12.** Presentence report, November 25, 1975, p. 7. As mentioned above, McClain admitted having a drug habit which approached a $200 daily cost; and at varying times he has been addicted to heroin, cocaine and valium. Admittedly McClain has enrolled in several drug rehabilitation programs since 1970, but with no success. *Id.*, p. 6. Otherwise, all we know of McClain's health is that he has some physical disability due to an ulcer on his left leg and allegedly a bullet lodged in his back inflicted by gambling creditors. *Id.*, p. 6.

**13.** In it the writer reveals he "became a born-again believer while being in prison myself. My whole life was changed.... I myself being part of N.Y. State prison ministry team talking with men and women in jails and prison have a pretty good sense of knowing when they are real and ready for a change in life. I spoke with Marvin McClain, and I think he is ready for another chance to prove he can be a decent man with selfless reasons to restore within himself some human dignity and respect for others and the law. Not only man's, but God's law also."

**14.** THE DEFENDANT: ... I think he is a wonderful person ..., he got in trouble as a youngster also, and he has went further ..., he has

got into the ministry ..., once I am released, that he will assist ..., and prepare me ... to be a productive person in society. Minutes of Oral Argument, October 1, 1981, pp. 31, 32.

**15.** Report of U.S. Probation Officer, October 1, 1981: "[He] a former felony offender impressed [us] as being sincere in his desire to assist the defendant in re-effecting a stable community adjustment.... Whatever positive influence he might have on the defendant, will, to a large degree, depend upon how receptive the defendant might be to accepting ... guidance which is religiously oriented."

**16.** Minutes of Oral Argument, October 1, 1981, pp. 34, 35.

**17.** Presentence Report, November 25, 1975, pp. 2, 6.

**18.** *Id.*, p. 6. In October, 1952 McClain was given the Pintner Intelligence Test A, registering an I.Q. of 77. *Id.*

**19.** All of the information concerning McClain's criminal history has been gathered from the Presentence Report prepared for his sentencing on December 3, 1975.

charged with larceny. He was adjudged a delinquent child by the Manhattan Children's Court and discharged.[20]

Only a little more than a year after this first brush with the law, McClain was again arrested for larceny in New York City on August 6, 1954. This time he had stolen, forged and cashed an $88 Department of Welfare check. The Manhattan Children's Court on October 25, 1954 again adjudged McClain a delinquent child and committed him to Children's Village, a center for the "treatment, research, training and prevention of children's emotional problems."[21] The records of Children's Village state that McClain was admitted there on October 25, 1954 and remained in this institution's custody until February 1, 1961. However, local probation authorities have informed our probation office that McClain's discharge date from the Children's Village was in fact October 19, 1957.[22]

McClain's next encounter occurred in 1962 when he was twenty (20) years old. On April 20, 1962 he was arrested and charged with "Manslaughter by Motor Vehicle." The presentence report indicates that McClain, while driving an automobile in Prince George's County, Maryland, accidentally drove off the highway. As a result of the accident, occurring at approximately 2:55 A.M., a passenger in the automobile died of injuries sustained. However, for reasons not revealed to us, this charge was never prosecuted and in fact dismissed pursuant to a *nolle prosequi*.[23]

The remaining segment of McClain's criminal history, save one charge, centers around the trafficking and possession of narcotic drugs. McClain himself has admitted that since 1961 he has been periodically addicted to heroin and cocaine, with the cost of the addiction being approximately $200 a day.[24] Only six (6) months and a few days after his arrest in Maryland, McClain was arrested and charged on October 24, 1962 in New York City with the felonious possession of narcotic drugs. The presentence report indicates that McClain "acting in concert with five others" was arrested for the possession of sixty (60) glassine envelopes containing ¼ ounce plus 10 grains of heroin. On January 25, 1963 he was convicted of unlawful possession of narcotic drugs, a misdemeanor, in the Supreme Court, New York County. He was sentenced to the New York City Penitentiary for six (6) months.[25]

Apparently McClain's previous convictions and periods of incarceration did not dissuade him from his earlier ways, for he was again arrested on September 13, 1963 in New York City for the felonious selling of narcotic drugs, felonious possession of narcotic drugs with the intent to sell and the unlawful possession of narcotic drugs. On March 17, 1964, in the Supreme Court, New York County, McClain was convicted for the felonious selling of narcotic drugs and sentenced to the State Reformatory at Elmira.[26]

The presentence report does not reveal the length of the sentence imposed on this conviction, but McClain was paroled from Elmira on November 18, 1965. However, McClain's liberty was short lived, for on July 28, 1966 he was charged with violation of parole. Our presentence report indicates that McClain's file with the New York State Division of Parole cannot be located, and we are therefore left without the details of this parole violation.[27]

McClain was paroled again from Elmira on July 16, 1968, approximately two years

20. Presentence Report, November 25, 1975, p. 2.

21. *Id.*, p. 5. Children's Village is located in Dobbs Ferry, New York. *Id.*, p. 2.

22. *Id.*, p. 2.

23. *Id.*, p. 3.

24. *Id.*, p. 6.

25. *Id.*, p. 3.

26. *Id.*, p. 3. In March, 1964 the New York County Supreme Court Psychiatric Clinic classified McClain as a " 'Sociopath, with drug addiction' " and that he was without psychosis. *Id.*, p. 6.

27. *Id.*, p. 3.

after his initial arrest for violation of parole. Less than a year passed before McClain was arrested again. On April 28, 1969 he was apprehended for possessing six glassine envelopes containing an unspecified amount of heroin. Apparently McClain was in a highly agitated state when arrested. He resisted the arrest, striking a police officer who subsequently needed hospital treatment for the injuries he sustained. Once he was subdued, McClain attempted to bribe the arresting officer, offering him $300 to drop the charges.

The presentence report states that McClain was allegedly engaged in "riotous conduct with approximately 50 other individuals which caused damage to two radio patrol cars of the 28th Precinct of the [New York City Police Department]."[28] As a result, McClain was charged with bribery, obstructing governmental administration, criminal possession of a dangerous drug in the fourth degree and assault in the second degree. On September 3, 1969 he was convicted of the bribery charge in the Supreme Court, New York County, and sentenced to a one (1) year term to run consecutively with the unexpired portion of any sentence he had remaining before he was paroled.[29]

The presentence report does not reveal the precise length of time McClain was incarcerated due to the disposition of the bribery charge, but it appears that he must have been at liberty on April 9, 1970, for he was again charged with violation of parole on that date. As hereinabove discussed, McClain's parole records cannot be located, and we are therefore left without the details and nature of the violation. However, we do know that as a result of this parole violation McClain was returned to state prison, only to be discharged on December 11, 1970.[30]

McClain's final recorded encounter with the law, before the events which form the basis for the instant offense, was on February 6, 1975 when he was arrested for disorderly conduct in New York City. Allegedly, McClain and others had congregated on a street corner in Manhattan, and when ordered by the police to disperse, failed to do so. On February 8, 1975 the charge was dismissed in the Manhattan Criminal Court.[31]

c. Defendant's assaultive nature

In addition to the defendant's behavioral problems already noted herein, we are compelled to comment on his behavior while imprisoned. In an updated presentence report to us (dated September 30, 1981) we are reliably informed by its author, who conferred with a case manager at the Metropolitan Correctional Center and "reviewed the institutional file material," as follows: ". . . on 4–6–77 inmate McClain was involved in a fight with another inmate . . ."; ". . . a corrections officer detected an odor of yeast while making routine rounds. A search of the area disclosed approximately two gallons of 'brew' in McClain's area, resulting in his being charged with possession of intoxicants. . . . McClain admitted that he was responsible . . . and stated . . . he felt that it was an alternative to narcotics."

Further, "on 2–13–78 McClain was found fighting with another inmate . . . . McClain [had] superficial cuts to his face and neck. . . . Claimed to have fallen down the stairs." Also, ". . . on 7–19–78 . . . McClain attempted to prevent an officer from locking the dining room by attempting to force his way through the partially opened door so that he can gain access to the dining room himself." And on July 1, 1980 McClain was again charged with fighting.

The reporting official sums up his detailed investigation: "Our case file reveals a copy of a Bureau of Prisons form entitled 'Program Plan' dated 3–12–76 which makes note of a transfer recommendation as fol-

**28.** *Id.*, p. 4.

**29.** *Id.*

**30.** *Id.*

**31.** *Id.*

lows: 'this man is dangerous, impulsive and hedonistic. He has little regard for human life.' Unfortunately, the report is neither signed nor dated. Upon careful review of available materials ... the undersigned has come to regard him as a particularly dangerous individual who does not appear to have benefited from past experience."

At oral argument on October 1, 1981 defense counsel argued that the prison in Atlanta, Georgia where the defendant had been incarcerated is "known to be a place of great violence, where many inmates were killed by other inmates, in most heinous ways." [32] Certainly we cannot take judicial notice of this unsupported estimate. Even if it be so, as to the particular episodes of McClain's prison deportment we are inclined to the belief that McClain was often the aggressor and a "disruptive influence."

### d. No contrition

The remarks of defendant's attorney at sentence (December 3, 1975) are worthy of repetition: "I frankly, too, have not seen a great deal of remorse in him. He is not that open with me. He is calculating, and he is hesitant ... I can appreciate the fact that there aren't a lot of positive things in the record for your Honour, ..."

We have searched in vain for meaningful evidence of true contrition by McClain (we only have his word for it). Nor is there even a murmur of a plea for forgiveness. Often we have witnessed offenders thrash about as they comment on the cause and the situation wherein their crimes had been incubated and matured; they expose and dissect their moral nature at the time of arrest; they demonstrate the perception and acknowledgement of fault, the will to make restitution, their acceptance of the community's moral sanctions. Not so with McClain.

### e. Defendant's work effort in prison

We welcome the detailed recital of defendant's work in prison since the imposi-

tion of sentence in 1975. It is indeed favorable and we take it into consideration by reducing the maximum penalty which 18 U.S.C. § 2113(d) carries with it. By no means, however, does this amount to an assurance that defendant has "reformed." Standing alone it positively does not furnish a reliable response to the primary test as to how deep-seated and impervious to attack is his moral conviction for clean living founded on good morals—that he will not slip back, reinfect himself and infect still others by succumbing sooner or later to the magnetism of the urge to pick up where he left off. Commendable prison deportment by way of work effort is only some evidence on the issue to be resolved, neither to be disregarded nor overestimated.

We do not despair of the defendant's chances ultimately to achieve moral values that will enable him to climb to higher ground. In the main, that is up to him. We do not say that his industry while in present confinement has been solely to earn "credits" which will support his application for parole and entitle him to other benefits; such conduct may be coupled with a strong desire to "go straight." We simply do not know—so thin is the evidence before us. In view of what is known of the whole man, satisfactory and impressive evidence of true rehabilitation and contrition, involving solidly embedded moral values that assure his own good moral living without danger to the community, are best left to behaviorists, the psychiatrists and scholars in allied fields, whose impressive testimony might well turn the tide in McClain's favor.

### Applicable Law

■ McClain advances the argument that in our *de novo* sentencing of him on the section 2113(d) count, we cannot impose a term of incarceration greater than fifteen (15) years—the term we imposed originally; that the double jeopardy clause of the Constitution precludes us from taking such action.[33]

---

**32.** Minutes of Oral Argument, October 1, 1981, p. 8.

**33.** Memorandum for Petitioner, filed September 4, 1981, pp. 3–8; Minutes of Oral Argument, October 1, 1981, pp. 12–16.

His argument centers around two decisions of our Circuit Court, *Miller v. United States*, 147 F.2d 372 (2d Cir. 1945), and *United States v. Sacco*, 367 F.2d 368 (2d Cir. 1966). In *Miller*, the defendant was convicted of count one for bank robbery, count 2 for putting life in jeopardy when committing the offense, and count 5 for conspiracy. The defendant was sentenced to consecutive terms of ten (10) years on counts 1 and 2, and two (2) years on count 3. Miller contended that counts 1 and 2 "denounced" only one offense and that the sentence on count 1 should be vacated. The district court denied defendant's motion.

On appeal the Circuit Court agreed with defendant that the sentence on either count 1 or 2 was invalid. *Miller, supra*, 147 F.2d at 374. The Government argued that since the sentence on both counts one and two did not exceed what could have been imposed on either count, the entire sentence was valid and should not be disturbed. *Miller, supra*, 147 F.2d at 373. However, the Court rejected this argument:

> "In this situation, it is quite plain that because the court could have imposed on one count a sentence equal to the consecutive sentences he imposed on the two, the matter may not be treated as though he had done so."

*Miller, supra*, 147 F.2d at 374.

In *Sacco* our Circuit Court was confronted with a situation where the District Court had sentenced defendant to five (5) years on one count where the maximum penalty was ten (10) years, and seven (7) years on a second count where the maximum was five (5) years. *Sacco, supra*, 367 F.2d at 368–69. Sacco filed a Rule 35 motion to have his sentence corrected after serving eight months. The District Court denied defendant's application and granted the Government's cross-motion to "transpose" the excess of the seven year sentence within the first Count. *Sacco, supra*, 367 F.2d at 369. On appeal, the Second Circuit stated:

> We are of the opinion that a judge should not be permitted to increase a sentence clearly and explicitly imposed, after the prisoner has begun to serve it, even though the judge later recollects that he had intended at the time to decree a longer sentence for a conviction on a particular count but did not do so because he had inadvertently confused it with another count. This is not the case of an error in reporting or a purely clerical error or a judicial mistake corrected the same day or the imposition of a sentence less than a mandatory minimum or similar flaws which present quite different problems. The possibility of abuses inherent in broad judicial power to increase sentences outweighs the possibility of windfalls to a few prisoners.

*Sacco, supra*, 367 F.2d at 369–70.

However, the validity of the *Sacco* decision which "was based upon the 'general rule that increasing a sentence after the defendant has commenced to serve it is a violation of the constitutional guaranty against double jeopardy,'" *McClain v. United States*, 643 F.2d 911, 913 (2d Cir. 1981) (citation omitted), has been questioned (as has the *Miller* decision) by our Circuit. *McClain, supra*, 643 F.2d at 913.

McClain acknowledges that the Circuit Court has questioned the validity of both the *Miller* and *Sacco* decisions in light of the Supreme Court's decision in *DiFrancesco*, 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980), McClain nevertheless argues that the rationale of *DiFrancesco* does not alter these earlier Second Circuit precedents; and in fact provides further support for his contention that the double jeopardy clause precludes an increase in the sentence. In essence, he argues that the Supreme Court in *DiFrancesco* clearly delineated the circumstances in which a sentence would not be given Constitutional finality: (1) where there is a statute authorizing an increase; or (2) where there is a common law or historical basis to do so. McClain states that none of these exceptions to Constitutional finality exist here; and that until the Third Circuit's decision in *United States v. Busic*, 639 F.2d 940 (3d Cir. 1981), it was well settled that it violated double jeopardy to increase a legal sentence on one

count when a sentence on another count was successfully challenged on appeal.[34]

For its part, the Government argues that according to the *DiFrancesco* decision a sentence does not have the same constitutional finality which would be accorded, for instance, a judgment of acquittal. Further the Government argues that increasing McClain's sentence would not "implicate" any of the policies underlying the double jeopardy clause: no new trial is required; no additional record need be made; the resentencing here is not due to any action on the part of the Government; this is not a second attempt at convicting the defendant; and the original sentence did not impose a "legally enforceable expectation on McClain's part that he would not be imprisoned for more than 15 years on the Section 2113(d) charge." [35]

Finally, the Government argues that we should adopt the holding of the *Busic* decision as it confronts the "precise" question now before us.

In *United States v. Busic*, 639 F.2d 940 (3d Cir. 1981) defendants Busic and LaRocca were convicted of narcotics and possession of firearm counts, also two counts for violation of 18 U.S.C. § 111, armed assault on federal officers. Additionally, Busic was convicted of violation of 18 U.S.C. § 924(c)(2), *carrying* a firearm in the commission of a federal felony. LaRocca was convicted of 18 U.S.C. § 924(c)(1), *using* a firearm in the commission of a federal felony. Each defendant was sentenced to a total of thirty (30) years: five (5) years (concurrent sentence on the narcotics counts); five (5) years (concurrent sentence on the firearm and assault charges); twenty (20) years (for the § 924(c) violation).

On appeal to the Third Circuit, the defendants contended that they could not be sentenced consecutively for violations of 18 U.S.C. § 111 and § 924(c). The Circuit Court decided that LaRocca's sentence could not be enhanced under both sections, but that he could be sentenced under either at the Government's election. As to Busic, the Third Circuit found that he could be sentenced under both sections since he was convicted of *carrying* a firearm; that this did not merge with the other count.[36]

On writ of certiorari the Supreme Court held that neither Busic nor LaRocca could be sentenced under 18 U.S.C. § 924(c) and remanded the case.[37]

On this remand, the Third Circuit was confronted with an argument raised in the Supreme Court but not decided there. The Third Circuit stated:

> In the proceedings before the Supreme Court, the Government urged that should the Court find section 924(c) to be inapplicable to the defendants, it should not only vacate the section 924(c) sentences but also those imposed by the district court under section 111. This, the Government asserted, would permit the district court to resentence the defendants under the enhancement provision of section 111 and thus carry out its initial intention to deal severely with the armed assaults now knowing that it had impermissibly relied on the enhancement provisions of section 924(c). Because this court had not considered this contention, the Supreme Court expressed no opinion as to whether in the particular circumstances of this case such a disposition would be permissible. *Busic v. United States*, 446 U.S. 398, 412 n.19, 100 S.Ct. 1747, 1756 n.19, 64 L.Ed.2d 381 (1980).
> *Busic, supra*, 639 F.2d at 942.

The Third Circuit then undertook an analysis of the historical and common law underpinnings of the double jeopardy clause and surveyed case law precedents interpreting the Clause, including the *DiFrancesco*

---

**34.** Memorandum for Petitioner, filed September 4, 1981, p. 4; Minutes of Oral Argument, October 1, 1981, pp. 13–14.

**35.** Government's Memorandum of Law, filed September 14, 1981, p. 15. See Minutes of Oral Argument, October 1, 1981, pp. 21–24.

**36.** *Busic v. United States*, 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980).

**37.** *Id.*

decision. The Court first recognized that for double jeopardy purposes sentencing has been treated differently than acquittals. *Busic, supra*, 639 F.2d at 944.[38] Next, the Court of Appeals realized that if defendants Busic and LaRocca were sentenced to the maximum on the 18 U.S.C. § 111 counts, they would still receive a total sentence less than that of the original sentence. This double jeopardy " 'injury' ", the Court stated, was less than the " 'injury' " a defendant would suffer under the now valid *DiFrancesco* intrusion on double jeopardy. *Busic, supra*, 639 F.2d at 950. The teaching of *DiFrancesco* is that a statute authorizing an appeal by the prosecutor on grounds of leniency is valid and does not violate the double jeopardy clause of the Constitution.

The Third Circuit had an added rationale supporting their ultimate conclusion. They reasoned that the trial judge had a "plan of sentencing" and chose to "spread his sentence over each of the counts upon which defendants had been convicted...." *Busic, supra*, 639 F.2d at 950. If the District Court was not allowed to re-sentence the defendants, the Third Circuit felt that effectively the intent of the sentencing Judge would be thwarted.

Finally, the Third Circuit found a strong societal interest for permitting a re-sentencing of these defendants:

Inherent in this societal interest is the fundamental principle that a convicted felon should receive a sentence appropriate to the gravity of the offense and the character and propensities of the offender. In vacating the section 111 sentences and permitting resentencing for the armed assaults, particularly in the absence of another trial, 'we cannot say that the constitutional guarantee against double jeopardy of its own weight restricts the imposition of an otherwise lawful single punishment for the offense in question.'

*Busic, supra*, 639 F.2d at 953 (citing *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969)).

As a result of the analysis, the Third Circuit held that the defendants could be re-sentenced on the remaining counts, and that this sentence may be "greater than, less than, or the same as the original sentence." *Busic, supra*, 639 F.2d at 953 (footnote omitted).

McClain argues that the Third Circuit's decision in *Busic* was incorrectly decided. In his argument before this Court, McClain contends:

Indeed, the reasoning in *Busic* is the converse of the approach taken in *DiFrancesco* : double jeopardy is determined by the finality historically attributed to a sentence. A sentence which fails to accord with the intent or plan of the judge has never due to that fact been held to be non-final, and accordingly it cannot be increased. Busic is in conflict with *DiFrancesco*.[39]

We cannot agree with McClain on this issue, and we adopt the reasoning and holding of the *Busic* decision. We believe that the double jeopardy clause of the Constitution does not prevent us from sentencing McClain to a term of imprisonment longer than fifteen (15) years.

### Conclusion

■ "The Constitution does not require that a sentencing should be a game in which a wrong move by the judge means immunity for the prisoner." [40] We have examined with great care every scrap of material relating to this case from the day we received it (October 14, 1975) to the present (all of which is made a part of this disposition). Our judicial obligation com-

---

**38.** In *DiFrancesco* the Supreme Court stated: "... our task is to determine whether a criminal sentence, once pronounced, is to be accorded constitutional finality and conclusiveness similar to that which attaches to a jury's verdict of acquittal. We conclude that neither the history of sentencing practices, nor the pertinent rulings of this Court, nor even considerations of double jeopardy policy support such an equation." *United States v. DiFrancesco*, 449 U.S. 117, 101 S.Ct. 426, 435, 66 L.Ed.2d 328 (1980).

**39.** Memorandum for Petitioner, filed September 4, 1981, p. 8.

**40.** *Bozza v. United States*, 330 U.S. 160, 166–67, 67 S.Ct. 645, 648–49, 91 L.Ed. 818 (1947).

pels us to impose sentence on this defendant who entered a plea of guilty to a violation of 18 U.S.C. § 2113(d). The maximum penalty fixed by law is twenty-five (25) years and/or $10,000 fine. 18 U.S.C. § 2113(d). For reasons hereinabove recited, we are constrained to, and do, reduce the sentence to twenty (20) years. We imposed it on October 19, 1981, based on this opinion in its entirety. See Minutes, October 19, 1981.

SO ORDERED.