UNITED STATES of America,

v.

George OCHS, Defendant.

No. 77 Cr. 0775 (IBC).

United States District Court,
S. D. New York.

Sept. 22, 1982.

**504**

John S. Martin, Jr., U. S. Atty., S.D.N.Y., New York City, for United States; Peter D. Sudler, Sp. Asst. U. S. Atty., Walter S. Mack, Jr., Asst. U. S. Atty., New York City, of counsel.

Steven H. Gifis, Princeton, N.J., and Larry Bronson, West Orange, N.J., for defendant.

## OPINION

IRVING BEN COOPER, District Judge.

Movant, George W. Ochs, now seeks an order granting him a new trial based on newly discovered evidence and on certain alleged constitutional violations.[1] The gravamen of his motion papers, numerous supporting affidavits subsequently submitted and repetitive contentions at the hearing on the instant application[2] is that a key government witness who at trial testified on the extremely serious extortion charge subsequently recanted her testimony; that prosecutorial misconduct precluded exculpatory evidence from being presented to the jury regarding the false tax exemption charges; and that all of the foregoing "rendered the entire trial a hollow mockery of justice," requiring a new trial on all seven felony counts of the original indictment.[3] The government remains steadfast and argues that "[movant's] present excursion, conjuring up 'newly discovered' evidence and fabricating testimony of prosecutorial misconduct and recantation, is yet another attempt to obstruct justice and to frustrate the fair and just disposition of his case."[4] For reasons set forth below, we are compelled to deny, on the facts and the law appertaining thereto, the instant application in all respects.

### Proceedings to Date

This motion by Ochs comes nearly four years after our first involvement with him. On October 26, 1977 a seven count indictment was filed charging him with Count 1: the use of extortionate means to collect a loan he had made to Debbie McElroy (18 U.S.C. § 894); Count 2: obstruction of justice by endeavoring to influence witnesses subpoenaed to testify before a grand jury (18 U.S.C. § 1503); Counts 3 through 5: falsely subscribing income tax returns for 1971, 1972 and 1973 by claiming personal exemptions to which defendant knew he was not entitled (26 U.S.C. § 7206(1));

---

1. Ochs' conviction and sentence were affirmed, *United States v. Ochs,* 461 F.Supp. 1 (S.D.N.Y. 1978); *United States v. Ochs,* 595 F.2d 1247 (2d Cir.), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979); as was our denial of his subsequent Rule 35, Fed.R.Crim.P., motion to reduce his sentence, *United States v. Ochs,* 490 F.Supp. 1206 (S.D.N.Y.1980), *affirmed in unpublished opinion,* 636 F.2d 1205 (2d Cir., 1980).

2. Ochs concedes that the hearing we held (on December 14, 1981, January 8 and 22, 1982) accorded him more than ample due process: "Preliminarily, we emphasize that this Court in the context of the hearing provided by it extended the concept of due process to its most fundamental essence. It cannot be gainsaid that no truth was suppressed by judicial action and no probative fact was unexplored due to judicial inaction. Stated somewhat differently, this Court impartially directed the generation of a full and fair hearing which was wholly protective of movant's rights. Thus, the sole task which remains is the weighing of credibility of the witnesses. . . ." Post Hearing Memorandum in Support of Motion for New Trial, dated April 6, 1982, pp. 1–2.

3. *Id.* at 25–26.

4. Post-Hearing Memorandum in Opposition, filed May 14, 1982, p. 20.

Count 6: failing to file an income tax return for 1974 (26 U.S.C. § 7203); and Count 7: evasion of his 1974 federal income taxes (26 U.S.C. § 7201).[5]

The jury trial commenced on January 16, 1978. The proof adduced by the Government demonstrated that between 1974 and 1976 the defendant conducted a loansharking business while owning and operating a house of prostitution/massage parlor in New York City; that he threatened to murder Debbie McElroy, a prostitute who had worked for him, for failure to make payments on a usurious loan he had made to her. Further, the trial record revealed that defendant falsely claimed exemptions in 1971, 1972 and 1973 for a non-existent wife and children, and that in 1974 he failed to report as income on his tax return $25,000 which he derived from his prostitution and loansharking endeavors. Finally, the proof also established, to the jury's belief beyond a reasonable doubt, that Ochs had approached several witnesses subpoenaed to testify before the grand jury and instructed them either to lie regarding payments of interest on loans made by him or to assert their Fifth Amendment privilege.

On February 6, 1978 the jury returned its verdict finding the defendant guilty on each of the seven counts.

At sentencing on April 14, 1978 we were confronted with a man who had been arrested thirteen times from 1944 to 1977 on serious criminal charges ranging from rape and armed robbery to bribery and extortion by threat. While such sentences as were meted out to him varied, the net result was that Ochs has been imprisoned for the greater part of his adult life. As we noted before and emphasize now again, Ochs displayed "a criminal behavior pattern we regarded shocking and repugnant to an offensive degree." [6]

At sentencing we talked to the defendant (as has always been our practice throughout more than four decades of judicial function) in terms that he could understand: [7]

> I don't want to give you a lecture. I don't think the lecture would do you any good, and I don't think that the judge means anything to you except insofar as what he is going to, to use the vernacular, 'hand out.' I don't think that I have that capacity to influence you, and so, therefore, I don't see any purpose by a recitation of what you have done with your life. In my book, you have been in moral bankruptcy from the time you were a boy.... [H]ow you ... failed to see that you weren't getting anywhere is beyond me, because you are not a fool. You have a good head. You just didn't put it to use in the right direction.

After careful reflection, striving to do justice to the defendant and community alike, we sentenced Ochs to 23 years imprisonment: 7 years on Count 1; 5 years on Count 2; 3 years on each of Counts 3, 4 and 5; and 2 years on Count 7; the sentences to run consecutively.[8]

Ochs appealed his conviction claiming numerous reversible errors. His primary position was that a police search of an automobile in which he was a passenger turned up certain loansharking and prostitution records which were illegally received at trial in violation of his rights under the Fourth Amendment; and that the imposition of a 3 year sentence on each of the three false exemption counts was so irrational that it was a "manifest abuse" of our discretion.[9]

Each of Ochs' challenges was rejected by our Circuit Court of Appeals. As to the Fourth Amendment issue, the Court stated in essence that the search of an automobile which the defendant was using was a proper inventory search and as such the records

---

**5.** See Indictment, *United States v. Ochs,* filed October 26, 1977.

**6.** *United States v. Ochs, supra,* 490 F.Supp. at 1208.

**7.** *United States v. Ochs, supra,* 490 F.Supp. at 1208–10.

**8.** Imposition of a sentence on Count 6 (failure to file a tax return) was suspended as we considered it a lesser included offense encompassed by Count 7 (tax evasion).

**9.** *United States v. Ochs, supra,* 595 F.2d at 1262.

which were uncovered were properly admitted into evidence.[10]

Ochs' attack on the sentence was likewise rejected. The Court stated: [11]

> On the undisputed record disclosed in the presentence report, the judge could reasonably have given Ochs an even higher total sentence than he did. Particularly in light of our disposition of the suppression claim, we are not concerned with how the sentence was structured.

United States v. Ochs, supra, 595 F.2d at 1262 (emphasis ours).

After having served two years of the twenty-three year sentence we imposed, Ochs made a motion for reduction of his sentence pursuant to Fed.R.Crim.P. 35.[12] In support of that application the defendant argued, in essence, that his deportment during the first two years of incarceration was "exemplary"; that he had "demonstrated a commitment to self-improvement and adjustment"; that he had "effected a complete reversal of the inertia which [grasped] him at age 16 and carried him through 32 years of lost life"; and that "[i]t [was] . . . necessary to reassess [him] . . . in light of his new attributes." [13] We stated then:

> We deal here with a person whose whole being during the greater part so far of his adult life has been saturated with criminal intent translated into almost uninterrupted lawless activity. Without a doubt, he has been a determined offender against community well-being. Apprehension concerning his motives and movements is bound to ensue. The right to move safely, unmolested, to be secure at work and home, to be protected against

frauds and schemers, is paramount. For it, the community pays a huge price, and is intolerant of failure or laxity on the part of its agents and instruments. It cannot be patient with or concerned about the welfare of offenders while they threaten its security and comfort. Many such offenders are crafty professionals whose aim is to bleed the community's resources for their own pleasures, at times using the instruments of the law itself to carry out and safeguard their operations and personal safety.[14]

After careful review of Ochs' criminal record, efforts at rehabilitation and deportment during his two years of imprisonment, we were constrained to deny his motion in all respects and noted the total lack of satisfactory evidence on what was needed for a thorough understanding of this defendant's "revised" moral character, capacity to rehabilitate and educability; that if we are to sentence the whole person and not the crime alone, a thorough inquiry as to the true capacity of the offender is paramount.[15] Indispensable is a thorough search for all details having even the slightest bearing on a defendant's character, past and present. Often such an inquiry proves rewarding, for it supplies insights into strengths and weaknesses not theretofore revealed and furnishes enlightenment as to how best to write the sentence prescription. This approach is imperative and has long been encouraged and approved. In the exercise of his discretion, the judge may "*consider information about the convicted person's past life, health, habits, conduct, and mental and moral propensities. . . .* Highly

---

10. *Id.* at 1259.

11. On appeal the defendant also argued that he was deprived of effective assistance of counsel, because his attorney's father died during the trial and was therefore unable to devote "his full attention and zeal to defendant's trial." Appellant's Brief on Appeal, filed September 5, 1978, pp. 62–68. Our Circuit Court of Appeals rejected this assertion too. See *United States v. Ochs, supra,* 595 F.2d at 1262. Our own reaction to this assertion remains the same as of this writing.

12. The defendant alternatively asked for the establishment of a minimum term at the expiration of which he would be eligible for parole or a maximum term after which he would be released on parole. *United States v. Ochs, supra,* 490 F.Supp. at 1207.

13. *Id.* at 1208–09.

14. *Id.* at 1215.

15. *United States v. Ochs, supra,* 409 F.Supp. at 1211. *See, e.g., United States v. Unterman,* 422 F.Supp. 228 (S.D.N.Y.1976); *United States v. McClain,* 527 F.Supp. 209 (S.D.N.Y.1981).

relevant—if not essential—to his selection of an appropriate sentence is the *possession of the fullest information possible* concerning the defendant's life and characteristics.... [The] modern philosophy of penology ... [emphasizes] that the punishment should fit the offender and not merely the crime." *Williams v. New York,* 337 U.S. 241, 245–47, 69 S.Ct. 1079, 1082, 1083, 93 L.Ed. 1337 (1949) (emphasis supplied). See also 21 U.S.C. § 850.

We concluded: [16]

We do not despair of the defendant's chances ultimately to achieve moral values that will enable him to climb to higher ground. In the main, that is up to him. We do not say that his industry and pleasantness while in present confinement have been solely to earn 'credits' which will support his application for parole and entitle him to other benefits; such conduct may be coupled with a strong desire to 'go straight.' We simply do not know—so thin is the evidence before us. In view of what is known of the whole man before and since our sentence was imposed, satisfactory evidence of true rehabilitation and contrition, involving solidly embedded moral values that assure his own good moral living without danger to the community, are best left to the psychiatrists and scholars in allied fields, whose impressive testimony might well turn the tide in defendant's favor.

**16.** *Id.* at 1218–19.

**17.** *United States v. Ochs, supra,* 636 F.2d 1205 (2d Cir., 1980).

**18.** Count One of the indictment filed against Ochs on October 26, 1977 reads:

1. From in or about early 1973 up to and including the date of filing of this Indictment, GEORGE OCHS, a/k/a "George the Ox," the defendant, owned and operated several New York City massage parlors, including the Studio I massage parlor, located at 100 West 43rd Street, New York, New York, which he operated as a house of prostitution.

2. From in or about April, 1975 up to and including September, 1975, in the Southern District of New York, Debbie McElroy was employed as a prostitute at several New York City massage parlors, including the Studio I massage parlor, owned and operated by

Ochs challenged our Rule 35 determination and on appeal argued primarily that he was denied due process because we did not first obtain reports from behaviorists, psychiatrists or psychologists (as he had requested) prior to our decision. Our Circuit Court of Appeals rejected this challenge and all others noting that no such reports were available at the prison prior to our determination, and that no petition for reargument on that basis was made subsequent to our determination. Our decision was affirmed in all respects.[17]

Against this background Ochs brought on the instant motion for a new trial.

### Extortion Charge

Ochs offered evidence at the hearing that the testimony of Debbie Frank McElroy, the witness at trial who testified that Ochs threatened her with physical violence for failure to make payments on a loan he had made to her,[18] was subsequently recanted by her.

At trial, McElroy testified as to the threats she had received from Ochs on two occasions:

A I received a phone call from George.

Q Do you remember when you received this telephone call?

A In July of 1975.

Q Did you have a conversation with him when you received this telephone call, the defendant?

GEORGE OCHS, a/k/a "George the Ox," the defendant.

3. On or about April 4, 1975, Debbie McElroy borrowed $1,500.00 from GEORGE OCHS, a/k/a "George the Ox," the defendant, and agreed to repay him the $1,500.00 plus $400 interest within nineteen weeks.

4. From on or about April 4, 1975 up to and including September 30, 1975, in the Southern District of New York, GEORGE OCHS, a/k/a "George the Ox," the defendant, unlawfully, wilfully and knowingly did use extortionate means, to wit, the use and the express and implicit threat of use of violence and other criminal means to cause harm to the person, reputation and property of Debbie McElroy, in order to collect and attempt to collect from the said Debbie McElroy an extension of credit and to punish her for the nonrepayment thereof.

(Title 18, United States Code, Section 894.)

A I did.

Q During the conversation did he identify himself to you on the telephone?

A Yes, he did.

Q How did he identify himself?

A By saying that it was George.

Q Did you recognize the voice on the telephone?

A At first I didn't.

Q Did you later recognize the voice?

A I did, yes.

Q Whose voice did you recognize it to be?

A George's voice.

Q In as much detail as you can remember, would you tell us what the defendant, George Ochs, said to you during that telephone conversation and what you said to him?

A I said that I was unable to make that amount of payment and he said, 'Well, we will figure something out, but you have been reneging and I guess you want your head broken and to be floating in the river.' [19] It was a threatening phone call.

. . . . .

Q [W]hen you heard him say those words, Mrs. McElroy, what was your reaction?

A I was very scared for my life.

. . . . .

THE COURT: Well, whatever happened on this occasion, certainly, you have a right to tell us in your own words.

THE WITNESS: There was a knock at my door, to my apartment, and I was a little bit afraid, your Honor, the conditions of what had passed between George and I, and also I was afraid, because usually when someone comes to my house they ring from downstairs in the lobby, because there is video security. So I

didn't understand someone just knocking at my door to my apartment. And I went very quietly up to the front door of my apartment and I looked out the peephole, and I saw George, and I was very afraid. He was wearing a building maintenance suit, and it made me very suspicious and I was very afraid and I didn't say anything behind the door. And he kept on ringing and ringing the doorbell and finally said, 'I know you are in there.' And I said, 'Who do you want?' And he said, 'I want to talk to Debbie.' And I said, 'Debbie is no longer living here. I believe she may be down South. I am subletting the apartment.' And he said, 'Well, you tell her her friend George was here and if she don't pay me my money, she is going to have a broken head and be found floating in the river.'

Q What did you say?

A I said I would tell her.

Q Was there any further conversation?

A No.

Q What was your reaction when you heard these statements by the defendant, George Ochs?

A I was very afraid.[20]

That defendant resorted to threats of physical violence to McElroy was also the trial testimony of Bobbi Carter,[21] a friend of McElroy and a prostitute who worked at the Eros "massage" parlor. She too had a telephone conversation with Ochs:

Q Inasmuch detail as you can remember, can you tell us what Mr. Ochs said to you during that telephone conversation and what you said to him?

A He said that I still owed him $260 and I told him that I didn't owe anything because I had given the $360 to Debbie to give to him because I was sick and I didn't want to leave the house. He told me that she had given him the check, but

---

**19.** To facilitate reading the testimony quoted, we have put in the single quotation marks at this point and hereinafter.

**20.** T.T. 299–301; 305–06. See also H.T. 465–69. (T.T. refers to the Trial Transcript held in 1978; H.T. refers to the Hearing Transcript

held on December 14, 1981 and January 8 and 22, 1982).

**21.** Movant's efforts at locating Ms. Carter for the purposes of this hearing have been unsuccessful. See Affidavit, James S. Kingsley, verified July 17, 1982, ¶¶ 8–9.

that it bounced, so that left me still liable for the $260 that bounced, and he said he had not heard from Debbie for a while and she had not been bringing her payments, so I should get in touch with her, and then he got excited and started yelling and said that if I didn't get in touch with her and she didn't get in touch with him, she would be found floating in the East River with her arms and legs broken. . . .

Q Did you make an attempt to find Debbie Frank?

A Yes.

Q Were you successful?

A Yes.

Q Did you have a conversation with her?

A Yes.

Q Will you tell the Court what you told Miss Frank during that conversation?

A I told her that she had messed me up and that George had just called me and told me that I owned [sic] him $260 and that she had to get up the money then and he wanted to hear from her.

Q Did you tell her anything else concerning the latter part of the conversation?

A I told her what he said about finding her floating in the East River.[22]

Further supportive testimony at trial came from Alan Viggiano, a friend of McElroy who also managed one of Ochs' "massage" parlors. Viggiano talked to McElroy the day after Ochs tried to break into her apartment: "Well, when she came up to see me, she was very excited and she said something in reference to somebody tried to get into her apartment last night. They tried to break into the apartment and she was very upset over it and I said to her, 'What are you talking about.' She got like very hysterical, she started crying and I tried to calm her down. . . . Q. I under-

stand that, but did she ever discuss with you a problem concerning the loan she had with George? A. The only problem she mentioned to me was that day that somebody tried to break into her apartment dressed in a maintenance uniform or something on that order and she was very upset about it. She was talking about committing suicide and she went off and was ranting and raving.[23]

At the hearing on the motion for a new trial Robin Ann Davis (Robin Ann Robison or Robinson), a friend of Ochs[24] who had worked for him as a prostitute, testified as to the alleged recantation:

Q. Did you ever meet Debbie after the case?

A. Yes.

Q. Where did you meet her?

A. On Eighth Avenue.

Q. What was she doing there?

A. I assume working. . . .

Q. Did you have a conversation with her on that occasion?

A. Yes, I did. . . .

THE COURT: What did she say she was doing? Did she say anything?

THE WITNESS: I didn't even recognize her. She called my name, and I turned around and I looked, and she says, 'It's Debbie.' She says, 'Hello, Robin.' And I started speaking to her, and she told me that she was sorry about George getting so much time that she—from what she understood that he was only going to be sentenced to seven years maximum.

Q. Did she tell you she lied or did she tell you she told the truth at George's trial?

A. She told me she was scared and she did not tell the truth.

Q. What did she tell you she was scared of?

---

22. T.T. 493–94.

23. T.T. 579–81.

24. Apparently Ochs and Davis are on friendly terms, for they speak to each other on the telephone three or four times a week since

A. For going to jail for a case she had pending.[25]

It is clear that McElroy has no criminal record. See H.T. 677–78.

Russell Woodward, formerly a manager at one of Ochs' "massage" parlors (as well as one owned by Jerry Schwartz) testified that he too had spoken to Debbie Frank sometime in 1978 or 1979: [26]

Q After Mr. Ochs was convicted, did you ever see Debbie Frank?

A Yes. I had occasion to meet her on 42nd Street.

Q Was anyone with you when you met her?

A Yes, Robin Roberts.

Q Will you tell us what the circumstances of that meeting were?

A Well, she walked up and asked us how George had made out and Robin told her, 'How the hell did you expect him to make out after what you did? He got 23 years.'

And she told us, 'Well, I'm hustlin' and I don't have time to talk but that ain't what I was told, I was told he was going to get about seven years. If I knew it was going to turn out like that, I wouldn't have did it.'

He said, 'What do you mean, you wouldn't have did it?'

She told us the story she had to do it because she was arrested for drugs and if she hadn't of did what she was told to do they were going to make the case bigger. So we took them to—I said, are you sure of this? So we took her to the St. James where another girl that had worked with her knew her, named Dianne Klein, and

defendant's incarceration in this case. H.T. 111.

she repeated the same thing in her presence and another fellow who was supposed to be here today, named Mike, that if she had of knew that Mr. Ochs' case was going to turn out like it was she would never have testified like she did because it was all a lie.

Q Have you seen Debbie Frank since that occasion?

A Only on one time and I never got close to her and she was hustlin' on Eighth Avenue.

Additionally, Hud Collins the self proclaimed "King of Porn" who allegedly controlled "20 or 30 or 40 massage parlors" and allegedly worked during Ochs' investigation as an undercover informant for the Department of Justice and New York City and State Departments of Investigation, testified at the hearing that McElroy told him she was being intimidated by law enforcement agencies who threatened her with prosecution for her failure to cooperate, and that Ochs never threatened her.[27]

Against this backdrop, the Government produced Debbie Frank McElroy. She testified: [28]

Q Did you have a conversation with Robin Ann Robinson in November or December of 1979?

THE COURT: Did you have a talk with her?

THE WITNESS: No, I did not.

THE COURT: On any subject?

THE WITNESS: No, I did not.

Q Did you ever have a conversation with Russell Woodward in November or December of 1979?

A No, I did not.

25. H.T. 136–38; See also Affidavit, Robin Ann Robison (Davis), verified December 14, 1981, ¶¶ 9, 11. The affidavit indicates that this conversation took place in October, 1980.

26. H.T. 360–61. See also Affidavit, Russell Woodward, verified July 16, 1981, ¶ 8. We find that the exact date of this meeting is uncertain notwithstanding the date alleged (November or December, 1979) in Woodward's affidavit. See H.T. 376–80.

27. H.T. 205–15. It is significant to note that F.B.I. agent Purser—one of the agents Collins supposedly worked with—was unable to locate anything in the F.B.I. or New York City Police Department records which indicated Collins did undercover-informant work beyond his answering questions on two separate occasions put to him by the F.B.I. agent investigating Ochs' case. H.T. 255; 260–62. Agent Purser was unaware of Collins' "undercover work."

28. H.T. 600–01; 617–20.

Q Did you ever tell anyone in 1979 that your testimony at trial was untrue?

A No, I did not.

Q Was your testimony at trial in United States v. George Ochs the truth, the whole truth and nothing but the truth?

A Yes, it was.

Q Did you ever go to the St. James Hotel and speak with Russell Woodward or Robin Ann Robinson in November or December of 1979?

A No, I did not.

Q Did you ever do it at any other time other than November or December of 1979?

A No.

Q Did you ever tell anyone that the reason you testified in United States v. George Ochs was because you had been threatened with prosecution for heroin?

A No.

Q Did you ever state to anyone at any time, ever, that the Feds, meaning the Federal authorities, had promised you that George Ochs would receive only a seven-year jail sentence in this case?

A No....

Q During the course of your work in the massage parlor, did you ever come to know a man named Russell Woodward?

A Not to my knowledge.

Q Did you ever come to know another girl who worked at the Galaxy named Dianne Klein?

A Not to my knowledge.

Q Did you ever come to know a girl who worked at the massage parlor by the name of Robin Ann Robinson?

A Not to my knowledge.

Former Assistant United States Attorney Sudler who conducted the trial for the Government against Ochs unequivocally testified that he did not in anyway induce the trial testimony of McElroy or Carter: [29]

Q With respect to both Ms. Carter and Ms. McElroy, did you make it known to them during the course of the investigation that they were subject to criminal charges?

A Never.

Q Did you ever indicate to them that you could cause them difficulty with the New York City Police Department?

A No, I did not.

Q Did you ever promise them anything in connection with their testimony?

A No, I did not.

Q Was Ms. Frank, Ms. McElroy—had she ever been charged with any crime?

A Not to my knowledge.

Q When you had her in here as a witness, not in this courtroom but in the prosecution of the case, did you check out her criminal record to verify that in fact she had or had not been charged with a criminal record?

A Yes.

Q And you are telling us that you never made any promises in connection with that, is that right?

A That's right.

In addition to insisting that the devastating testimony given by McElroy at trial had been recanted by her, movant, by way of a post-hearing motion, attempted to open the record to include further affidavits assailing the character and credibility of McElroy.[30] The substance of these affidavits is that McElroy perjured herself (again) when she testified at the hearing that she only used cocaine on one occasion; that in fact, McElroy used this and other hard drugs frequently.[31]

---

**29.** H.T. 677–78.

**30.** There being no objection by the Government to the introduction of these additional affidavits, movant's application is granted in all respects. *See* Government's Post-Hearing Memorandum of Law, filed May 14, 1982, pp. 3–4.

**31.** H.T. 613; Affidavit, Russell Woodward, verified March 5, 1982, ¶¶ 3–4; Affidavit, Hud Collins, verified January 27, 1982; Affidavit, Jack Pires, verified March 2, 1982, ¶¶ 3–4; Affidavit, Jerry Schwartz, verified March 4, 1982, ¶ 3; Affidavit, Mike Foglio, verified March 8, 1982, ¶¶ 3–5. McElroy's testimony at trial in 1978 was substantially the same as at the hearing. T.T. 337–38.

*Applicable law*

■ It is beyond cavil that when considering applications of the type here sought,[32] the "orderly administration of justice requires finality of judgment rendered after a trial unless injustice results. The findings of the trier of the fact, whether court or jury, should not be disturbed on motions for a new trial based upon alleged newly discovered evidence *except for the most extraordinary circumstances.*" *United States v. Fassoulis,* 203 F.Supp. 114, 117 (S.D.N.Y.1962) (Weinfeld, J.) (emphasis added). *See also United States v. Alessi,* 638 F.2d 466, 479 (2d Cir. 1980) (motions for a new trial *"should be granted only with great caution"*) (emphasis added). It is equally axiomatic that "[a] motion for a new trial on the ground of newly discovered evidence is addressed to the discretion of the trial judge. *In deciding it he may utilize the knowledge he gained from presiding at the trial as well as the showing made on the motion.*" *United States v. On Lee,* 201 F.2d 722, 723 (2d Cir. 1953) (emphasis added).

■ Also clear and well-defined is the general standard to be applied—the so-called *Berry* test [33]—when newly discovered evidence is proffered:

"The Court must be satisfied that the evidence (1) is in fact newly discovered, i.e., discovered since the trial; (2) could not with due diligence have been discovered earlier; (3) is not merely cumulative or impeaching; (4) is material to the issues, and finally, (5) is such, and of such nature, that upon a retrial it will probably produce an acquittal. *The burden of satisfying these requirements is upon the defendant.*" [34]

*United States v. Fassoulis, supra,* 203 F.Supp. at 117 (emphasis added).

■ The first requirement—newly discovered evidence—means no more than the fundamental, common sense thought *in haec verba* conveyed. This indispensable requirement is often fused in analysis with the second requirement that due diligence, on the part of both the defendant and his counsel,[35] could not have produced earlier the evidence now introduced. *United States v. Mello,* 469 F.2d 356, 358 (1st Cir. 1972); *United States v. Edwards,* 366 F.2d 853, 874 (2d Cir. 1966); *United States v. Costello,* 255 F.2d 876, 879 (2d Cir.), *cert. denied,* 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958).

We apply these tests to the hearing evidence offered by defendant that Government witness McElroy recanted her trial testimony on the extortion charge. Notwithstanding the fact that the precise date of the alleged recantation certainly was not crystalized (it is obvious that recantation of trial testimony can only occur after such testimony has been adduced), it is clear, according to the sworn testimony of Davis and Woodward, that the alleged conversations occurred long after (particularized herein below) the jury reached its verdict. *United States v. Edwards,* 366 F.2d 853 (2d Cir. 1966).

■ However, what is markedly deficient here (also with regard to the tax counts and the alleged incidents of sexual relations) is the utter and complete failure of due diligence by or on behalf of movant since this "new evidence" was discovered. Even assuming *arguendo* that this recantation occurred in October, 1980 (the latest possible date according to the totality of the proof on this score (see Affidavit, Robin Ann Robison (Davis) verified December 14, 1981,

---

**32.** To be distinguished are motions made within seven days of the verdict pursuant to Fed.R. Crim.P. 33 usually based on grounds other than newly discovered evidence. *See United States v. Rachal,* 473 F.2d 1338 (5th Cir. 1973); 8A Moore, Federal Practice and Procedure, ¶ 33.–02–.03; *United States v. Gilbert,* 668 F.2d 94 (2d Cir. 1981).

**33.** *Berry v. State,* 10 Ga. 511, 527 (1851).

**34.** *See also United States v. Kahn,* 472 F.2d 272, 287 (2d Cir. 1973); *United States v. De Sapio,* 456 F.2d 644, 647 (2d Cir. 1972); *United States v. Polisi,* 416 F.2d 573, 576–77 (2d Cir. 1969); *United States v. Alessi, supra,* 638 F.2d at 479.

**35.** *See, e.g., Estes v. United States,* 254 F.Supp. 314, 331 (W.D.Tex.1966).

¶¶ 9, 11)) there is not a word of explanation as to why movant waited until November 12, 1981 to bring on the instant application.[36] In this context, the enormous lapse of time—well over one year—is fatal.

The next element to be considered—whether the evidence is cumulative or impeaching—tests the quality of the proof offered. *See, e.g., Beyda v. United States,* 324 F.2d 526 (9th Cir. 1963). The evidence relating to McElroy's alleged recantation, in the state of equiponderance save credibility which characterizes it, requires little analysis.

Davis testified at the hearing that McElroy stated to her she lied at the trial because of a "case she had pending." As we already have pointed out, McElroy has no criminal record. McElroy, at the hearing, testified she could not remember whether she had ever known "Robin Ann Robison" (Davis' maiden name) and unequivocally denied ever having any conversation with Davis or Woodward. (See H.T. 600–01; 617–20). Davis testified the "recanting" conversation took place in October, 1980. Woodward believed it took place in 1978 or 1979 or November or December, 1979 depending on whether one reads his sworn testimony or affidavit. Woodward testified that Davis (as well as others) was present during his conversation with McElroy. Yet Davis did not refer to any one else being present—see her affidavits and hearing testimony. Woodward also testified that he, along with McElroy and Davis, went to the St. James Hotel, where McElroy allegedly repeated her recantation. McElroy testified she had never been to that hotel. As for Davis, she did not refer to it.

The inconsistencies set forth above, among others, succumb so disfavorably to the indicia of reliability that decades of judicial service have engrained in us, that we are compelled to discount the veracity of the entire testimony striving to establish recantation by McElroy.[37]

In sharp contrast we find McElroy's hearing testimony clear, unequivocal and forthright on this issue.[38] Her corroborated trial testimony remains unblemished by this disingenuous attack. *United States v. Troche,* 213 F.2d 401, 403 (2d Cir. 1954) (applying the so-called *Larrison* test); *United States v. Persico,* 339 F.Supp. 1077 (E.D. N.Y.), *affirmed,* 467 F.2d 485 (2d Cir. 1972).

The next element to be evaluated is whether the proffered evidence is material. Without question, were the proof on recantation found convincing, it would constitute a complete destruction of the extortion charge. However, any attempt to dissuade us from giving the same imprimatur of materiality to her testimony now which the jury did at trial cannot succeed, for McElroy made a convincing witness. We entertain no hesitation whatever in concluding that there exists no alternative to a positive rejection of defendant's proof on the alleged recantation by McElroy.

Against the weight of this evidence, movant also would have us accept the untenable position that subsequent to trial McElroy admitted lying in her testimony because she was told by F.B.I. agents Ochs would only receive seven (7) years in jail and that this testimony if offered at trial would probably have produced an acquittal; therefore Ochs should be granted a new trial. The proof on this point is ineffective in the extreme—it fails in its purpose.

Accordingly, we turn to the final element to be considered, and by far the most weighty: Whether the evidence is "of such nature that upon retrial, it will probably produce an acquittal." *Fassoulis, supra,*

---

**36.** It is worthy of note that this application was filed within days after Assistant United States Attorney Sudler, the prosecutor in this case from its inception, left Government service to enter private practice.

**37.** We find the self-aggrandized testimony of Collins so unbelievable that it is not worthy of discussion.

**38.** The post-hearing affidavits submitted regarding the quantity of McElroy's prior drug use are unimpressive; the timing of their submission makes them highly suspect. They make no significant impact on our conclusions.

203 F.Supp. at 117. Although it is clear that this "probability" test does not apply in all instances, it is appropriate in this Circuit when the newly discovered evidence is offered to support a charge of perjury committed at trial or asserts recantation of earlier testimony.[39]

We have diligently applied this test to the total hearing testimony—on each and every ground asserted by defendant in his instant application. It is beyond cavil that he has failed it completely.

We maintain that not overcome by defendant is the unequivocal proof offered at trial which could lead to one conclusion only—best estimated by our Court of Appeals:

"The argument of insufficiency of the evidence on the extortion count, also raised for the first time on appeal, borders on the frivolous. It is unnecessary to go beyond the evidence, first communicated in slightly different terms through a friend and then directly, that if McElroy did not pay up, 'she is going to have a broken head and be found floating in the river.' [13] [fn. 13:] This aquatic threat seems to be quite venerable, see *United States v. Kennedy,* 291 F.2d 457, 459 (2d Cir. 1961)."

*Ochs, supra,* 595 F.2d at 1261.

As we see it, that quoted estimate firmly stands as of this writing.

### False Exemption Counts

Ochs challenges his conviction on counts 3 through 5, the false exemption counts, on the basis of newly discovered evidence.[40]

---

**39.** Other Circuits presented with these issues have applied the *Larrison* test, *Larrison v. United States,* 24 F.2d 82 (7th Cir. 1928), which requires the granting of a new trial where: "(a) The court is reasonably well satisfied that the testimony given by a material witness is false. (b) That without it the jury *might* have reached a different conclusion. (c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of it falsity until after the trial." *Id. See, e.g., United States v. Anderson,* 165 U.S.App.D.C. 390, 509 F.2d 312, 327 n. 105 (1974) (dicta), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975); *United States v. Johnson,* 487 F.2d 1278, 1279 (4th Cir. 1973); *United States v. Meyers,* 484 F.2d 113, 116 (3d Cir. 1973); *United States v. Briola,* 465 F.2d 1018 (10th Cir. 1972), *cert. denied,* 409 U.S. 1108, 93 S.Ct. 908, 34 L.Ed.2d 688 (1973); *United States v. Curran,* 465 F.2d 260, 264 (7th Cir. 1972) (dicta); *United States v. Strauss,* 443 F.2d 986, 989 (1st Cir.), *cert. denied,* 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971); *United States v. Smith,* 433 F.2d 149, 151 (5th Cir. 1970).

Our Circuit's reason for non-adherence is clear: "[T]he test, literally applied, should require reversal . . . with respect to even minor matters, especially in light of the standard jury instruction that upon finding that a witness had deliberately proffered false testimony in part, the jury may disregard the entire testimony. . . . However, rather than adopt the *Larrison* test and violate it in application, we believe . . . that the time-honored 'probability' standard is the more appropriate one for determining whether perjury calls for a new trial. . . . Upon discovery of previous trial perjury by a government witness, the court should decide whether the jury probably would have altered its verdict if it had had the opportunity to appraise the impact of the newly discovered evidence not only upon the factual elements of the government's case but also upon the credibility of the government's witnesses." *Stofsky, supra,* 527 F.2d at 245–46.

**40.** The indictment reads:

COUNTS THREE THROUGH FIVE

The Grand Jury further charges:

8. On or about the 15th day of April following each of the years enumerated below in Counts Three through Five, in the Southern District of New York, GEORGE OCHS, a/k/a "George the Ox," the defendant, a resident of the Bronx, New York, who between January 1, 1970 and April 15, 1974 was not married, unlawfully, wilfully and knowingly did make and subscribe and cause to be made and subscribed, United States Joint Income Tax Returns, Form 1040, verified by written declarations that they were made under penalties of perjury and filed with the United States Department of Treasury, Internal Revenue Service, which GEORGE OCHS, a/k/a "George the Ox," the defendant, did not believe to be true and correct as to every material matter in that GEORGE OCHS, a/k/a "George the Ox," the defendant, falsely claimed therein that he was married and had children as set forth below in Counts Three through Five under the caption "false exemptions claimed," whereas, in truth and in fact, as GEORGE OCHS, a/k/a "George the Ox," the defendant, then and there well knew, he was not married, did not have any children and was therefore not entitled to claim any income tax exemptions for a wife and children.

Specifically, the defendant asserts that several persons could and would have testified that indeed he was married and had children; that these potential witnesses did not come forward because of threats and other improper conduct on the part of the Government; and that only now has the Government's alleged grossly improper conduct come to light.[41] Ochs couples these allegations of prosecutorial misconduct with a claim of ineffective assistance of counsel in violation of the Sixth Amendment maintaining that his trial attorney could not render proper representation because of the death of counsel's father on the morning of the fifth day of trial.[42]

At trial, the measure of proof adduced impressively met the burden which the law makes imperative, so the jury found, and established that the defendant was not married, had no children and was not entitled to the income tax exemptions he claimed.

Much of the proof involving these issues was stipulated to by Ochs and his attorney. For example, a series of stipulations received into evidence concerned marriage, divorce and dissolution records of New York State including the five boroughs of New York City.[43] These showed that no record existed of a marriage between the defendant and his alleged wife, Marilyn; no record of a dissolution of marriage between defendant and Marilyn; and no records whatever relating to Alexander, George and William Ochs, the alleged children of defendant.[44]

Further, a stipulation (Government's Exhibit 64) was read to the jury which stated in part, " . . . that if an appropriate official of a New York State agency was called as a witness, that official would testify that during the period November 19, 1969 through May 18, 1971 the defendant was required to make a statement regarding his marital status, [and] the names of his dependents. . . . [T]hat agency had no indication that George Ochs was married or had any children during the period November 19, 1969 through May 18, 1971. The official would further testify that during this period the only known officially recorded residence for the defendant . . . was 2846 Marion Avenue, Bronx, New York where he resided with his mother and sister."[45]

It was also stipulated that if the appropriate representative of the Mason Tenders' District Council Trust Funds (of which Ochs was a participant) were called as a witness he would testify that the Funds' records reflected that Ochs was neither married nor had dependent children during the period September, 1970 to August, 1974.[46]

Not all of the stipulations entered into were adverse to defendant. For example, it was agreed that if a representative of Phelps Memorial Hospital were called, that person would produce a patient card (dated April 18, 1974) which reflected that the

| Count | Calendar Year Ending | False Exemptions Claimed |
|---|---|---|
| 3 | 1971 | Wife – Marilyn Ochs<br>Child – George<br>Child – William<br>Child – Alexander |
| 4 | 1972 | Wife – Marilyn Ochs<br>Child – George<br>Child – William<br>Child – Alexander<br>Child – Marilyn |
| 5 | 1973 | Wife – Marilyn Ochs<br>Child – George<br>Child – William<br>Child – Alexander<br>Child – Marilyn |

41. Post Hearing Memorandum in Support of Motion for New Trial, dated April 6, 1982, pp. 1–4.

42. See Affidavit, Robert Blossner, Esq., verified November 12, 1981.

43. Government's Exhs. 50, 51, 52.

44. Id.

45. Government's Exh. 64. Indeed, Ochs challenged this stipulation on appeal on grounds of prejudice. The Court of Appeals rejected this argument stating, "in framing the stipulation, the Government and the court went far beyond anything required of them . . . to bring the danger of prejudice to Ochs as near to zero as was possible." United States v. Ochs, supra, 595 F.2d at 1261.

46. Government's Exh. 58.

defendant had a wife named Marilyn.[47] However, an emergency room admission form from Montefiore Hospital and Medical Center dated December 28, 1974 reflected that his nearest relative was Catherine, and indicated the relationship as "W." [48]

On the other hand, Milton Cohen, a witness for the Government, testified that he was friendly with defendant; that he saw and spoke to him almost every day during 1974–75; and that Ochs never told him he was married or had children.[49] At best, as Cohen testified, he saw the defendant with the same "girl friend" two or three times.[50]

Likewise, Irene Uhl, who knew the defendant for twenty-two years, testified: [51]

Q. Have you known Mr. Ochs to be married?

A. No, I don't know if he is married. I saw him with a woman.

. . . . .

Q. Have you ever known Mr. Ochs to be married?

. . . . .

A. No, I don't know.

. . . . .

Q. Have you ever known him to have children?

A. No.

Q. Has he ever lived at 27 Hillcrest Avenue with a wife and children?

A. No.

Jerry Schwartz, a "massage" parlor partner of defendant, testified at trial that he was a close associate of his,[52] but did not know he had a wife and children:

Q Have you ever known Mr. Ochs to be married in your entire relationship with him?

. . . . .

A No.

Q Have you ever known Mr. Ochs to have children during your entire relationship with him?

A No.

. . . . .

Q Has Mr. Ochs ever said anything to you that would lead you to believe that he had a wife and/or children?

A No.

Q Do you know if Mr. Ochs has a girl friend?

A I was introduced to someone.

Q When were you introduced to someone and whom were you introduced to?

A I was introduced to a woman as Ann.

Q When were you introduced to Ann?

A I could not be specific on the date.

Q Was it on more than one occasion?

A I met her a few times.

Q Can you remember the year that you met this woman?

A I could not truthfully give you a specific day.

. . . . .

Q Mr. Schwartz, did you have a conversation with Mr. Ochs concerning the charges contained in this indictment that he claimed a wife and four children as exemptions on his tax returns?

A After the article appeared in the newspaper—

THE COURT: No. He just asked you a simple question.

THE WITNESS: Yes. I answered that. . . .

Q Will you tell us what the conversation was? What did you say to him and what did he say to you concerning that subject?

A I asked him if he was referring to an article that was in the newspaper in reference to the matter that you are mentioning.

Q What matter was that?

A About his having a wife and four children. . . . I asked him about it, and

47. Government's Exh. 58. *See also* Government's Exh. 68.

48. Government's Exh. 56.

49. T.T. 532–33.

50. T.T. 532–33, 537–38.

51. T.T. 826–27.

52. T.T. 726–27.

he said to, 'Well, you have met my wife and children.' And that was it.

Q Had you, in fact, met his wife and children?

A No, I had not.[53]

Of great significance, the mother of defendant, Katherine Ochs, (called to the stand by defendant) testified on direct examination that her son was not married:

Q Mrs. Ochs, did there ever come a time when your son brought a woman to your house?

A Yes, sir.

Q And introduced her as his wife?

A Yes, yes.

Q Can you tell us when that was?

A I believe it was in the early part of February, '72. . . .

Q Do you remember how you can tell it was in February of 1972 that this incident happened?

A My daughter works for the phone company and they were out on strike at that time.

Q Can you describe to us where this incident happened?

A On my front porch.

Q Can you tell us what happened?

A A car pulled up at the curb and George got out with this woman and he brought her up on the porch and he was begging me to let them stay there. So I asked him if he was married and he said no. I said then you can't stay here with a woman. Because I don't believe in it. I believe in being married in the church. If you want to live here, go and get married to her.

Q Did he ever come back with that woman?

A Once or twice he came around but not in the house. She never got out of the car.

Q Can you describe that woman to us as she was in February of 1972?

A The first thing, she was pregnant which you couldn't miss. She had brown hair and probably about 35 years old.

Q Had George ever said anything about her to you before that day?

A No.[54]

On cross-examination she testified:

Q Do you know if your son is married now?

A No, not now.

Q Do you know if he ever was [married] back in 1971, '72 and '73?

A No.

Q Do you know if he had children?

A He didn't have none of his own, only the children that the woman had, which she says belonged to her first husband or something.

. . . . .

Q Do you know if her children's names were George, William and Alexander?

A I tell you, I never spoke to the children; I didn't go to the car to see them because he said he was not married to the woman; so I didn't want to be bothered. I had enough on my mind.

Q Did he say that the children were his?

A No.

Q Did he say whether he had named the children?

A No. He said they belonged to her first husband or deceased husband.[55]

The only witness at trial who purportedly had met the defendant's "wife" was Otto Narday, a self-admitted "best friend" of defendant, who owed Ochs $12,000 covering loans at the time of trial.[56] In fact, it was in Narday's car that Ochs was arrested. On direct examination Narday testified that he had met the defendant's wife:[57]

Q Did there ever come a time when Mr. Ochs introduced a woman to you?

A Yes, he did.

Q Can you tell us how she was introduced to you and where?

53. T.T. 726–27, 738–39.

54. T.T. 1208–10.

55. T.T. 1212–14.

56. T.T. 1174.

57. T.T. 1177.

A It goes back some two, three years. He say 'That's my wife,' and it was in a restaurant in the night-time where I work. They come in and they had a meal there.

Q Did you ever see that woman again?

A Maybe once afterward.

Q Can you describe her to us?

A I believe she was a heavyset dark-haired woman.

However, on cross-examination Narday stated that he did not remember the name of Ochs' wife or his children:

Q I would like you to describe again the circumstances of your meeting Mr. Ochs' wife. Where did it happen?

A Star's Delicatessen, 593 Lexington Avenue.

Q When did that happen?

A I was working in the evening, late evening, and George and the lady, young lady introduced his wife came in and had supper there.

Q Did they have four little kiddies with them when they came in, Mr. Narday?

A No, no children.

Q What was the name of Mr. Ochs' wife?

A I can't remember. Very bad with names.

Q You can't remember the name of your best friend's wife, is that your testimony?

A Well, I was not associated with his wife as much as with himself.

Q How many times other than the incident you have just described have you been associated with his wife?

A Only those two occasions.

Q When was the second occasion? What year?

A When they come into the restaurant again.

Q What year was this?

A Oh, go back about two, perhaps three years, not more than two and a half.

Q Can you be more precise as to the date? Was it the year 1975?

A It is very difficult for me because I see a lot of people in there and to remember the exact date is very hard.

Q But this is your best friend, Mr. Narday.

A Yes, but would I pay attention to it in any circumstances? Do I have to remember it at a future date when someone comes in or not? Not likely.

Q Did your best friend ever invite you up to his house for dinner with the wife and kids?

A No, I did not go there.

Q Did you ever invite Mr. Ochs with his family to your house for dinner?

A No. . . .

Q Did you ever go out socially with Mr. Ochs and his wife and family to a restaurant, to a movie?

A No.

Q Or to a ball game?

A No.

Q Did Mr. Ochs ever tell you that he had children with this woman that he introduced you to?

A Yes, he did.

Q When did he tell you that?

A In the restaurant.

Q How many children did he say he had?

A I don't know exactly, maybe two or three.

Q Did he tell you the names of the children?

A No.

Q Did you ever see the children?

A No.[58]

At the hearing on this motion for a new trial, the defendant sought to establish that potential witnesses were prevented, by prosecutorial misconduct and intimidation, from testifying that he had a wife and children.

In support thereof, Ochs called Frank Gambaro, a friend of his since 1965 when they first met at the Green Haven Penitentiary in New York where Gambaro was

---

**58.** T.T. 1190–93.

imprisoned for armed robbery.[59] He testified he had met Ochs' wife:

Q. Do you recall whether in 1972 you met a woman by the name of Marilyn?

A. Yes, I do. . . .

Q. When you first met Marilyn, how were you introduced to her?

A. I was introduced by George, that Marilyn was his wife.

Q. Where did that take place?

A. The first meeting we had was in the East Side New York, Puglia's Restaurant was the first.

Q. Do you recall Marilyn well enough to describe her?

A. Fairly well.

Q. Can you give us your recollection?

A. Anywhere from five to five two, brunette, petite.

Q. Do you recall anything particular about her?

A. Well, she was a handsome woman.[60]

Gambaro further testified that he was subpoenaed for the defendant's trial by the Government, and during the trial, but before he was called to testify, he was interviewed by an agent of the United States Attorney. Allegedly because his answers were not what the agent wanted to hear, he was "chased" out of the courthouse:

Q. Do you recall who that [agent] was?

A. Not offhand, no.

. . . . .

Q. Did he identify himself?

A. He identified himself as—I don't know if he used the term 'agent.' Something to do with the, you know, with the proceedings. I mean, I don't know if—I think he identified himself as an agent.

Q. What was the substance of the conversation he had with you, if you recall?

A. Yes. He asked me if George had a wife, if I ever met the wife, and I told him yes, I did meet his wife. He asked me if his wife or he used the word supposed wife, supposedly had a wife, that if she had children. And I said, 'Well, as far as I know, there was children through this marriage.'

He also asked me if George ever lent me money, and I told him no.

He asked me concerning other things that I don't recall, but everything that seemed to be adverse. And when I could not comply as far as my testimony, you know, what my statements were, I was chased out of the courtroom—not out of the courtroom, but to leave the court.

Q. Did the agent ask you or direct you to leave the courtroom, leave the courthouse?

A. He did.

Q. Do you recall any of his exact words?

A. His exact words?

Q. Yes.

A. He told me to—I told him that I wanted to take the stand.

THE COURT: You were asked do you remember the exact words he used when he told you to leave. That is what you were asked.

THE WITNESS: Well, it was, the reflection was a threatening tone, your Honor.

THE COURT: You recall his tone of voice as being threatening; is that what you mean?

THE WITNESS: It was threatening, yes.

THE COURT: Do you remember what he actually said to you?

THE WITNESS: Well, when I insisted that I wanted to testify, he told me to get out of the court before I get locked up.[61]

59. H.T. 52–53. Gambaro also admitted that he had been convicted for criminal offenses three times, the last for possession of a firearm. *Id.* at 67. Further, the affidavit submitted by Gambaro previous to his testimony stated that he first met Ochs in 1962 or 1963, not in 1965 as he testified. Affidavit, Frank Gambaro, verified December 14, 1981, ¶ 2.

60. H.T. 53. See the testimony of Otto Narday who described Ochs' wife as a "heavyset" woman. T.T. 1177.

61. H.T. 58–60. Despite his assertion that Ochs had children by this marriage, Gambaro's affidavit states: "To the best of my knowledge none of the children were actually George's. . . ." Affidavit, Frank Gambaro, verified December 14, 1981, ¶ 3.

On cross-examination Gambaro testified that he went out socially with the defendant, his wife and children. Absent were his particulars:

Q. By the way, do you know where [h]is wife is today?

A. Do I know where she is?

Q. That's right. Do you?

A. I think she might be back in Canada. I am not sure.

Q. Do you know where his kids are?

A. Well, they would be with her.

Q. Did you ever see the kids?

A. I saw two children, yes.

Q. Describe them.

A. Describe them?

Q. Yes. Describe them.

A. They were the age 8 or 9 years old, sort of—

Q. Boys, girls?

A. One boy, one girl.

Q. What were their names?

A. I don't recall.

Q. What did they look like?

A. They looked like the mother.

Q. Where did you see them?

A. I saw them when we went out socially a few times.[62]

Also on cross-examination, Gambaro again stated that he did not testify at the defendant's trial because of the actions of the agents of the United States Attorney:

Q. Who was the agent that allegedly escorted you out of the courtroom, sir?

A. I didn't say he escorted me out of the courthouse.

Q. Well, what did you say?

A. I says he told me to leave the courthouse.

Q. Did he threaten you?

A. His reflection was a threatening tone.

Q. What do you mean by his reflection? Did he in words tell you to get out of the courthouse or something bad would happen to you? Did he say that to you?

A. More or less, yes.

Q. What did he say? What were his exact words?

A. He told me to get out of the courthouse or I could be arrested.

Q. What is the name of the agent who said that, sir?

A. I don't know his name.

Q. What did he look like?

A. I honestly couldn't tell you.

Q. What was he wearing?

A. He was wearing a suit.

Q. What color was the suit?

A. I don't know. You are asking me something four years ago, almost.[63]

Jerry Schwartz, the defendant's former partner, admitted that he had daily contact with Ochs when they were in business together. However, he testified at the hearing he did not know if the defendant was married or had children:

Q. The question is: As you sit here on the stand today, Mr. Schwartz, do you know whether Mr. Ochs is married?

A. Do I?

Q. Yes.

A. No.

Q. Do you know whether Mr. Ochs has four children?

A. I never saw the children.

Q. Did you ever see Mr. Ochs' wife?

A. I met a girl that was with him for a number—a period of years. As a matter of fact, since I know him in '73 he had one particular person in his presence.

Q. Was this a girlfriend?

A. She was just introduced by name. It wasn't specific whether it was a girlfriend or wife.

---

**62.** H.T. 75–76.

**63.** H.T. 70–71. Gambaro admitted on cross-examination that there were several inaccuracies between his sworn testimony and his affidavit. In one instance his affidavit stated: "An agent approached and questioned me ... [h]e then conferred with another individual standing near us *who was the Assistant District Attorney*

Sudler." Affidavit, Frank Gambaro, verified December 14, 1981, ¶ 4. Despite this clear assertion that Gambaro knew who Mr. Sudler was at the time of defendant's trial in 1978, he now admits that he first learned of Mr. Sudler's identity the first day of the hearing, December 14, 1981. H.T. 61–64.

Q. Did you ever ask Mr. Ochs whether he was married to this woman?

A. No, I didn't.

Q. Do you know whether he was married to this woman?

A. No, I don't.[64]

Robin Ann Davis (Robin Ann Robison or Robinson), a friend of Ochs since 1974 and formerly a prostitute engaged at one of his "massage" parlors, testified that the defendant indeed had a wife and children:

Q. With respect to Mr. Ochs, did you ever come to learn of him having any family during the time period that you worked?

A. Yes.

Q. How did you learn about any family that he may have had?

A. Well, one time I was coming out of the parlor to check on the fly boy on the corner.

Q. Check on the what?

A. The guy that stands on the corner that hands out the pamphlets. And George was in the car with his wife, and he called me over to sit with her while he went upstairs to see Jerry.

Q. Did you have a conversation at that time with this woman in the car?

A. Yes, I did.

Q. Did you know her name on that occasion?

A. Yes, I did.

Q. Was that the first occasion you became aware of Mr. Ochs' having a relationship with this woman?

A. No, I had spoken to her on the phone, but that's the first time I saw her.

Q. When you say you spoke to her on the phone, was that because she called the massage parlor or because you called Mr. Ochs' house?

A. She would call looking for George.

Q. And when she called looking for George, who did she say was calling?

A. His wife.

Q. Did you know her name?

A. Marilyn.

Q. On how many occasions would you say from the time period that you met this Marilyn until 1977 you spoke to her on the telephone?

A. Quite a few times.

Q. And on how many occasions did you see her?

A. Three times.

Q. Did there ever come a time period when she was no longer living with Mr. Ochs?

A. Yes. He was going with another—I saw him later on right before the parlor was closed with another woman and I assumed they had breakin' up—broken up.

Q. Did you ever have any discussions with Mr. Ochs about this first woman, about the nature of their relationship?

A. It was plain. I took it for granted that that was his wife.

Q. Did you come to know if he had any children with this woman?

A. She stated the few times that I talked to her that she was very, you know, indebted to George; that since she had met him, her kids have had, you know, better clothing and the better things in life.

Q. Did she say how long she had been living with Mr. Ochs?

A. No, I didn't get too personal with her. She was very timid. She didn't like coming around the massage parlors.

Q. Was she an American person or was she foreign?

---

64. H.T. 99–100. Schwartz's testimony was largely an attempt to establish the alleged threatening practices and improper behavior of the prosecution. He testified at the trial under a grant of immunity. At the hearing he asserted that he was forced to sign an attorney/client waiver because Ochs' trial counsel had formerly represented him. Schwartz stated: "He [Mr. Sudler] told me that I was going to sign a waiver on this lawyer, on this privileged infor- mation, and if I did anything to screw up the case or cause a mistrial [it] was going to be me on the stand instead of George Ochs." H.T. 83. However, the record of the trial reflects the contrary. There, Schwartz was represented by another attorney who advised and counseled his client to sign the waiver. Further, Schwartz clearly and unequivocally stated on the record that he freely signed the waiver. T.T. 705–11.

**522**

A. She had a French accent.

Q. Did you ever come to find out where she was from through conversations with her?

A. Did I? No.[65]

At the hearing, Davis insisted that she came to the courthouse to testify for Ochs, but did not for she was "escorted" out of the courthouse by a federal agent:

Q. When you got to the courthouse, will you tell us what happened?

A. I was asked to leave.

Q. Do you have any recollection as to who it was that asked you to leave the courthouse?

A. I think it was Mr. Sudler told an agent, Ben Purser, to take me out of the courthouse.

Q. Did you know this man, Mr. Purser?

A. Yes, I had seen him on other occasions.

. . . . .

Q. Did you have a conversation with anyone from the U. S. Government, either FBI, IRS, Mr. Sudler?

A. No conversation.

Q. What was that?

A. No conversation.

Q. Did anyone at any time ask you to leave on that occasion?

A. Yes.

Q. Who was that?

A. Ben Purser.

Q. When I asked you if you had a conversation, you didn't talk to him, he just told you to leave; is that what happened?

A. Yes.

Q. ...Did he escort you out of the courthouse?

A. Yes, he did.

. . . . .

Q. Did you tell Mr. Blossner?

A. Yes.

Q. You told him that you were leaving the courthouse?

A. No, I did not tell Mr. Blossner at that time, no.

Q. Do you know who Mr. Blossner is?

A. He is George's attorney.

Q. Did you tell him that 'they are making me leave the courthouse?'

A. No.

Q. And when you came to the courthouse, what were you prepared to do?

A. Testify for George.

Q. What were you going to testify about on that occasion?

A. About meeting his wife, about his—about Jerry Schwartz being so intimidated by the government that he was afraid—he would tell them whatever they wanted to hear because he was afraid of going to jail.

. . . . .

Q. Where did you go after you left the courthouse?

A. I went home to Jersey.

Q. When you say you went home to Jersey, is that where you were living?

A. No, I went to my mother's house.

Q. Where was that?

A. Bayonne, New Jersey.

Q. Was there a reason you went to Bayonne, New Jersey, rather than your normal apartment or wherever it was you lived?

A. Because of the badgering and all the things I was going through, I couldn't take it no more.

Q. Who was badgering you?

A. Between having sex with Clark Hurley and worrying about Jerry going to jail and wanting George to testify for him and not being able to because of my love for Jerry.[66]

Davis further asserted that part of this "badgering" came from Assistant United States Attorney Sudler's behavior during meetings and interviews during the course of the investigation. She testified Mr. Sudler made it clear that if her then "boy friend" Jerry Schwartz did not cooperate, he might be a potential defendant:

---

**65.** H.T. 111–14.

**66.** H.T. 128, 132–34. *See also* Affidavit, Robin Ann Robison, verified December 14, 1981, ¶¶ 4, 5.

Q. How did he make this point clear to you?

A. By yelling and screaming. Things that I told him that he didn't want to hear, he just told me that he only wanted to hear what he wanted to hear.

Q. What do you mean by that in particular?

A. When I told him that I met George's wife, he didn't want to hear that; when I told him I had borrowed money from George without—and I knew of plenty other girls that had borrowed more money, Debbie Frank, were never scared of him; that Debbie Frank came up to the massage parlor after the alleged threat. He didn't want to hear that.[67]

However, at the close of her testimony the witness tempered her assessment of the prosecutor's behavior: [68]

THE COURT: There were about how many other occasions that you met Mr. Sudler either in his office or elsewhere?

. . .

THE WITNESS: There was other occasions, your Honor. He was always very arrogant. . . . And I was scared, because I didn't know what could happen. I was dealing with a federal DA. I had never been through anything like this before.

On this same factual issue, the next witness called by defendant at the hearing was Michael Foglio. He testified he had known the defendant for eight to ten years and was his partner in a "massage" parlor and movie house in 1974;[69] that Ochs was married and he (Foglio) so told the federal authorities:

Q. Was there ever an occasion in which two FBI agents came to your home during the period of April 1976?

A. Yes.

Q. Do you recollect what occurred on that occasion?

. . . . .

THE WITNESS: Ok. On that day, I don't recall what day it was, my bell rang, and I proceeded to answer the door, and three gentlemen were at the door and they told me to open it, that they were FBI agents. One pulled a gun because I had a dog there. He said, 'If you don't move the dog,' he is going to shoot my dog. At that time I let him in, because I didn't know who they were, I didn't see no identification at that time. Then they handed me a subpoena and asked me a few questions concerning George's case and his marital status.

THE COURT: His what?

THE WITNESS: Marital status. . . . Right after that, with the subpoena, I went down to court to go in front of the grand jury, and I was taken from the grand jury into Mr. Sudler's office. At that time Mr. Sudler asked me—or he told me, he said, 'I know that you have a drug case pending and we would like you to testify for us.' I told him that I can't help him because I don't know what he is talking about. At that time I was intimidated, I was told that if I was not on time for the hearing that he will have me arrested.

THE COURT: . . . Did you discuss the details of any testimony?

THE WITNESS: Some, your Honor, yes.

THE COURT: Tell me about that, will you?

THE WITNESS: Marital statuses, if he was married or not, and something about money.

. . . . .

THE COURT: What about the marital phase of his life? What was said by Mr. Sudler to you or you to him about that?

THE WITNESS: He asked me if I knew his wife.

THE COURT: And?

THE WITNESS: I said yes, I did.

THE COURT: What else did you say on that score?

**67.** H.T. 119–20.

**68.** H.T. 187.

**69.** H.T. 229–30.

THE WITNESS: That was it. I just mentioned that.[70]

On cross-examination Foglio testified that the grand jury proceeding and his meeting with Mr. Sudler took place in 1974.[71] The fact is that Mr. Sudler was not employed as an Assistant United States Attorney at that time; he was a law clerk to a federal judge in 1974.[72]

Stephen Napoli, who had known defendant for 40 years, also testified he was introduced by Ochs to a woman as his wife; that her name was Marilyn; and that Ochs was taking care of her and her children.[73] On cross-examination, Napoli admitted that he was neither approached by any agent of the United States nor threatened in any manner.[74] He did recall that a lawyer for the defendant met with him, but Napoli could not remember his name or the questions which were asked of him.[75]

Joseph Erskine, a friend of the defendant since 1947, called by defendant testified that he was first introduced to a woman by Ochs as his wife in 1971; that her name was Marilyn;[76] and that he saw Marilyn approximately ten times after initially meeting her.[77] Erskine further testified that when he met with federal agents in the summer of 1976 he told them of Ochs' marital status:[78]

Q Now, with respect to this case, were you ever interviewed by anyone from either the FBI or the IRS?

A IRS.

Q And when did that occur?

A In, I believe it was 1976, on the summer.

Q And do you recall the circumstances under which you were interviewed?

A Yes.

Q Where were you?

A In my house.

Q How was that interview set up?

A They called me, I believe, and they made an appointment with me and they came to my house.

Q And do you remember the names of any of the agents who came?

A One of them was John Edge....

Q And did you have any discussions with the agent concerning his wife?

A Yes.

Q Do you remember what he asked you and what you told him concerning his wife?

. . . . .

A He asked me did he have a wife and I told him yes. I mentioned the name; how many kids, I said he had four or five, I don't remember exactly, and that was it.

Erskine further testified that he came to the courthouse for the defendant's trial pursuant to a subpoena issued by the Govern-

---

70. H.T. 231–33, 239–40. Foglio was convicted of selling heroin to an undercover agent and was sentenced to two years to life. He served three and a half years of that sentence. H.T. 243.

71. H.T. 245.

72. Id.; H.T. 659. Mr. Sudler first joined the federal strike force in September, 1975 and became an Assistant United States Attorney in January, 1977.

73. H.T. 342–46. Napoli's affidavit in support of the defendant's motion did not state that he knew Ochs to be married. It stated that the defendant and Marilyn were "living together" from approximately 1971 through 1974. Affidavit, Stephen Napoli, verified November 2, 1981, ¶ 6.

74. H.T. 347–48.

75. H.T. 349–50. At the hearing, the Government moved to strike the testimony of Napoli as it was not germane to the issue at hand—prosecutorial misconduct. H.T. 349. The motion is denied as we deem this testimony helpful in assessing whether movant exhibited due diligence in discovering the alleged newly discovered evidence. For the same reason, the Government's motion to strike the testimony of Arthur McCall and the defendant is also denied.

76. H.T. 318–19.

77. H.T. 320.

78. H.T. 321–33. See also Affidavit, Joseph Erskine, verified June 14, 1982.

ment[79] and got into an argument with the prosecutor in the hallway:[80]

Q Would you tell us the nature of the conversation you had with [the prosecutor]?

A Well, I told him I would be on call, I will give you a phone number. I believe he ended up doing this, I think it ended up doing so. Can I give you a phone number, and I did. It is not necessary for me to be here every day they were calling a jury and he never called me as a witness.

Q Did you ever have an argument with Mr. Sudler?

A Oh, yes, sir.

Q When did that occur?

A He was telling me he is going to put me in jail for contempt, and he said, I'll have you in the goddamn can. I forget the words. How are you going to put me in jail? It's up to the Court. I don't know the functions of the Court that well, but I don't think he personally can put me in the can like he threatened to do me. I am willing to come here....

On cross-examination Erskine admitted he in fact did not know if Ochs was legally married to this woman.[81]

Russell Woodward, a friend of Ochs for 12 to 15 years and a former manager of one of the defendant's "massage" parlors, likewise testified that he knew Ochs to be married.[82] He testified that a woman named Marilyn would call the "massage" parlor every day between 1975 and 1978 asking for the defendant and stating that she was his wife; that he first met Marilyn in 1974 or 1975; and that Ochs and his "wife" were always together.[83] However, he only met this woman once face to face.[84]

Woodward further testified that he was prepared to testify that Ochs was married,

but was precluded from doing so because of the actions of the prosecutor and his agents:[85]

Q Did you ever have occasion to come down to the Federal Courthouse in connection with that subpoena or any other subpoena?

A I came down here one day.

Q Were you interviewed by anyone from the federal government or in Mr. Sudler's office or by Mr. Sudler?

A I never got to an office. I met two agents in the corridor out here. And they asked me what I was doing here and what I was going to say and I told them. They asked me had I talked to Mr. Sudler, and did I know him. I said, no, I hadn't spoke to anybody but Mr. Blossner, and when I said what I was going to say, they told me no, that's not what you're going to say.

Q Who was it that told you that?

A There was another little officer, this gentleman there came out in the corridor afterwards.

Q When you say 'this gentleman,'—

A The gentleman sitting there with his hand on his chin.

THE COURT: You mean Mr. Sudler?

THE WITNESS: That's the one I mean. At that time, I think the Judge and a black man, I think it was his secretary came out in the corridor and someone asked who was that. He said that's the Judge's secretary, and at that time I was told to leave the building.

Q Who was it that told you to leave the building?

A Him and that other little agent.

THE COURT: Are you talking about those who came to your door?

---

**79.** H.T. 323–24.

**80.** H.T. 324–25.

**81.** H.T. 337.

**82.** H.T. 352–53. It is worthy of note that Woodward testified on cross-examination that he did not know that Studio One, the "massage" parlor he managed, was a house of prostitution. He thought it was a "dating parlor." H.T. 368.

**83.** H.T. 352–54; 362.

**84.** H.T. 371.

**85.** .H.T. 356–58.

THE WITNESS: One of them that came to the door was one of them that approached me in the corridor. I didn't keep their names.

Q Did you have any conversation with the agent outside the courtroom as to what your testimony was going to be?

A Yes.

Q And what was it that you told the agent?

A I said I was going to testify that I knew George's wife, that I knew he was married, and that I had never known him, you know, to do any harm to anybody.

THE COURT: And he said, according to you, 'That's not what you're going to testify to'? Is that right?

THE WITNESS: That was the words.

THE COURT: Did he say what you were going to testify to?

THE WITNESS: No, he just told me, you have to excuse me miss, 'Get him the fuck out of the courthouse.'

In his affidavit, Woodward stated that he then told Ochs' trial attorney he did not wish to testify but assigned no reason. The attorney allegedly said that Woodward would not make a good defense witness if he was uneasy about testifying.[86]

Marilyn Erskine, who knew the defendant through her husband and had become friends with Ochs, also testified that she met his "wife"; that her name was Marilyn; and that they went out on occasion.[87] She further testified that Marilyn had four or five children and that the children belonged to Marilyn.[88]

The reason Mrs. Erskine was not called to testify at trial was never made clear at the hearing. She testified that she was never threatened by government agents; that she did meet with the prosecutor but did not recall if she was asked about Ochs' alleged wife; and that at most the prosecutor was "rude" to her.[89]

The last witness to testify at the hearing in support of the instant application for relief was the defendant. His testimony was, in essence, a broad-based attack on the alleged misconduct of the prosecutor, government agents and his own attorney.

Ochs testified that he was not married to Marilyn; that she was his common law wife;[90] that he made unsuccessful efforts (not elaborated) at locating her before trial.[91] On cross-examination he admitted listing a wife and four children on his tax returns for 1971, 1972 and 1973 and that they lived with him those three years. When asked for the names of the children, Ochs gave this testimony:[92]

Q ...Now, sir, on your 1971, '72 and '73 tax returns, you have listed exemptions for a wife named Marilyn and four children. Do you recall that, sir?

A Correct.

Q What were the names of the four children that you claimed as exemptions on those tax returns?

A Well, first of all, those names of those children.

Q Give me the names, please.

A The names?

Q Yes.

A Was George, Alexander, Marilyn, and I think—what was the other one, there was another one, they belonged to the wife.

Q You can't remember the fourth one? This was your child?

A No, it wasn't my child. It belonged to her.

Q It wasn't your child?

A It was her children by a previous marriage. I'm only living common-law.

Q I thought I heard you say it was the broad's child.

---

**86.** Affidavit, Russell Woodward, verified July 16, 1981, ¶ 7.

**87.** H.T. 427–30.

**88.** H.T. 430–31.

**89.** H.T. 435–36; 440–42.

**90.** H.T. 516.

**91.** H.T. 547.

**92.** H.T. 545–46.

A I don't know. Maybe I did. But it was her children by a previous marriage. She came from Canada—

Q And you can't remember the fourth child's name?

A No.

Q Right?

A Let me see, William. William was the other one.

Q William. Okay.

A Now, the reason I got them, that wasn't even their real names. Their real names they were some other names, they were French names and I renamed them myself, because if she is staying with me I want my own American names with me.

Q You renamed the children?

A Yes.

Q This was kind of rechristening or something?

A Sure, because I couldn't call the Jacques.

Ochs also testified that the efforts he expended to locate his alleged wife and children after the trial consisted of "thousands" of unsuccessful phone calls—no details furnished.[93]

The defendant was emphatic that the prosecutor spoke to him on one occasion, outside the presence and without the consent of his counsel, in an attempt to have him plead guilty; and likewise again during a recess at trial to determine what witnesses the defense was going to call.[94] Perhaps the most incredible allegation of prosecutorial misconduct made by Ochs was that the prosecutor knew, and so told him, that there was no knife in the car in which he was arrested, and therefore no basis existed for the defendant's arrest and search incident thereto leading to the discovery of the loansharking records.[95]

■ Lastly, Ochs testified what he perceived as ineffective representation by his trial counsel: [96]

Q Did you tell Mr. Blossner you had any witnesses available concerning the existence of your wife and children?

A Yes, I did.

Q And what was Mr. Blossner's response?

A Well, Mr. Blossner, all the while, even before the trial, he says that he really wasn't interested in the tax counts. But mostly it was during the trial, I am telling him I can get these witnesses to come in. I can get a hundred people come in and testify to my wife, my common-law wife. I wasn't married with her.

. . . . .

Mr. Blossner seemed to be concerned, he told me anyway, he's more concerned with the serious charges, which was the extortion charge in this particular case.

THE COURT: All right, and that's everything he had to say on that score, right?

THE WITNESS: Yes. That's right, your Honor. That's mostly what he was interested in. He said, 'The tax counts, if you got found guilty of, these tax counts which I don't want to occupy my time with, what you could get mostly is six months.'

I said, 'Six months is still six months for something'—he said—

Q Did he talk to any witnesses with respect to the tax counts?

A Now, at the night before there was some witnesses came down to his office on my insistence—oh, yes, I should answer yes. Yes, he did.

Q Did he call any witnesses to prove the existence of your wife and children in the trial?

A I don't know. No, I don't think so. I don't think he did. Not any witnesses I wanted him to call.

Q Did you request that he call witnesses?

---

**93.** H.T. 547; 552.

**94.** H.T. 487–88; 505–08.

**95.** H.T. 509–10.

**96.** H.T. 516–18.

A Absolutely.[97]

To refute the allegations made by movant, the Government called as witnesses the agents responsible for the investigation of this case, also the prosecutor in charge.

Benjamin S. Purser, Jr., the F.B.I. case-agent during the Ochs investigation, testified that he never coerced or intimidated anybody; that he never saw any I.R.S. agents or the prosecutor do so; that he never suppressed any testimony or evidence; and that he never escorted any potential witness out of the courthouse.[98] Purser further testified that he was present when the prosecutor interviewed potential witnesses and that the prosecutor was never abusive: [99]

> THE WITNESS: He was not abusive. He certainly did not use any type of foul language towards those individuals. He showed humanness towards them but definitely did not abuse them.
>
> THE COURT: Did he express himself forcefully with respect to his disbelief as to their position?
>
> THE WITNESS: Oh, yes, sir.
>
> THE COURT: In other words, if the witness was, in his estimation, not telling the truth, he said exactly that, that 'I don't believe you,' and said it with a certain amount of vocal force?

THE WITNESS: Oh, yes, sir, Mr. Sudler was very explicit.

Likewise, I.R.S. Special Agent Jack Edge, involved in the tax investigation of Ochs, and his assistant, I.R.S. agent Anthony Cesare, testified that they were never abusive or threatening; that they never suppressed evidence or escorted potential witnesses out of the courthouse.[100] Further, that they never heard the prosecutor use abusive language or intimidate witnesses.[101]

The last witness to testify for the Government on this phase was the prosecutor, Assistant United States Attorney Peter D. Sudler. He testified that he never told any witness to abstain from telling the truth;[102] that he never caused any witness to be escorted out of the courtroom;[103] and that none of the testimony presented by the Government at the trial was in any way untruthful or inaccurate.[104] Mr. Sudler further testified that during the course of the investigation many people were subpoenaed because Ochs' loansharking records were voluminous; and that many of these persons were never called at trial since their testimony was covered by the numerous stipulations entered into between the Government and defense and was otherwise cumulative.[105]

Mr. Sudler also testified that he did not threaten the defendant, but was himself

---

**97.** The defendant moved for the correction of portions of his testimony at the hearing. The motion is denied; all of the proposed "corrections" are utterly and wholly immaterial to the issues which confront us. Additionally, the transcript certified by the reporter "shall be deemed prima facie a correct statement of the testimony taken and the proceedings had." 28 U.S.C. § 753(b). *See also United States v. Carter*, 347 F.2d 220 (2d Cir. 1965).

The defendant has also submitted several affidavits of persons who did not testify at the hearing. *See, e.g.*, Affidavit, James McGregor, undated; Affidavit, William Uhl, verified November 16, 1981; Affidavit, Marie Koubek, verified December 14, 1981; Affidavit, William Uhl, verified June 17, 1982; Affidavit, Rolland W. Dague, verified February 12, 1982. In essence, these affidavits reveal that the affiants knew Ochs to be married, having met his wife, etc. Several recited that the federal authorities were made aware of Ochs "married" status. We make them a part of the total record.

However, there has been no showing of their unavailability at trial.

Finally, movant submitted a series of photographs allegedly showing him with his wife and children. However, the persons in the photographs have not been identified, and therefore they lack any probative value. We do not receive them.

**98.** H.T. 247–52.

**99.** H.T. 252.

**100.** H.T. 283–85; 292–93.

**101.** H.T. 285.

**102.** H.T. 660.

**103.** H.T. 663.

**104.** H.T. 660.

**105.** H.T. 662.

subjected to threats of physical violence by Ochs as well as Joseph Erskine and Hud Collins:[106]

Q Were you ever, Mr. Sudler, personally threatened by any witness during the course of the trial back in January of '78?

A Yes, I was.

Q Could you tell us something about that?

A I had a threat from a Mr. Joseph Erskine. The threat emanated from his refusal to comply with the Court's subpoena to attend the trial and there were a series of very heated arguments over the consequences of his failure to attend the trial. This culminated in a rather heated exchange and my statement to him that if he did not attend the trial pursuant to the Court's subpoena I would seek to have him held in contempt.

Q And did he respond to that in any way?

A Yes, he did. At various times he threatened me—'I'll get you,' words to that effect.

Q Now, have you been personally threatened by any other witness or person involved in the prosecution of Mr. Ochs?

A I have not been threatened by any other person during the hearings that have been held on this motion before Judge Cooper. Mr. Ochs has said at various recesses that he would take care of me, and then he qualified that by saying, 'You know, in a legal manner.' That is the extent of threats that I have received.

I have also been spoken to by an individual by the name of Hud Collins who periodically appears throught [sic] the scenario of this case, and he at various times has threatened me in various ways.

As to the assertion by Ochs that Sudler spoke to him outside the presence and without the permission of his attorney, Mr. Sudler admitted speaking with the defendant

on two occasions, but testified that this occurred in the presence of Ochs' attorney or with his knowledge[107] in an endeavor to ascertain whether the defendant wished to cooperate with the authorities.[108] It should be pointed out that the affidavit of Ochs' trial counsel states that it was his recollection he never consented to such interviews.[109]

We are of the unalterable belief that Assistant United States Attorney Sudler undertook his mission in this matter with diligence, fair-mindedness and firmness; he left no stone unturned and did not hesitate to denounce falsity or evasion or trifling with the truth whenever it reared its ugly head. He fulfilled his sworn obligation to pursue the truth uprightly and relentlessly, and thereby became entitled to experience the abiding satisfaction that comes from duty fully performed and a job well done.

\*　　\*　　\*　　\*　　\*　　\*

Ochs does not argue that the witnesses who testified at the hearing regarding the tax counts were newly discovered in the sense that their identity and potential testimony were unknown at the time of trial. Instead, he argues that misconduct on the part of the prosecuting authorities prevented these potential witnesses, allegedly armed with exculpatory evidence, from coming forward; and it is this misconduct which is newly discovered. The fundamental premise of this argument belies the total record before us.

 The evidence offered with respect to the false exemption counts can not support a finding that it was newly discovered, for we reject in toto the allegations made of prosecutorial misconduct. The witnesses called by movant in support of this theory were not convincing. Much of their testimony was saddled with uncertainty, evasiveness and clear contradictions.

Compared with the unconvincing testimony of movant's witnesses, we found the

---

**106.** H.T. 660–62. See also H.T. 674.

**107.** H.T. 663.

**108.** Id.

**109.** Affidavit, Robert Blossner, Esq., verified June 18, 1981, ¶ 2.

proof adduced by the Government clear, convincing and forthright. Each of the agents and the prosecutor testified that they in no wise threatened or intimidated witnesses, nor did they suppress any evidence favorable to the defendant. Contrary to what the defendant would have us believe, the record reveals that the prosecutor displayed humanness towards witnesses while determinedly moving forward with his investigation; in the instance of Jerry Schwartz and Robin Ann Robison he helped them find a safe place to stay when they were in fear of their safety. This firmly negates the deportment of a prosecutor bent on falsifying testimony, failing to reveal exculpatory information, threatening and intimidating witnesses.

Accordingly, in light of the total record before us, we have no alternative to rejecting the proof proffered by movant and conclude that none of the alleged instances of prosecutorial misconduct was established.

What is crucial is the immovable fact that the testimony of the witnesses who testified that defendant was married and had children is *not newly discovered.* As he would have us believe, his marriage and children were common knowledge within his circle of friends and acquaintances. The witnesses themselves admitted knowing the defendant, or being his friend, for many years before the trial. Despite defendant's bald assertion that he was "puzzled as to...the failure of other witnesses whom he anticipated to testify to do so," [110] the total hearing record is barren of any credible explanation why these witnesses were not subpoenaed and called to testify by the defendant at trial. In no way then can the proof adduced at the hearing be considered "new." [111]

As to the second element of the test for a new trial—whether the evidence could not have been discovered earlier by the exercise of "due diligence"—movant has completely failed to meet this burden of proof which the law imposes on him. Indeed, witnesses called by defendant give us cause to arrive at the inescapable conclusion due diligence in procuring witnesses was ignored. It must be remembered that a failure by defendant to call a witness to the stand in furtherance of trial strategy, etc. and absent prosecutorial misconduct is fatal in this context. *United States v. Pordum,* 451 F.2d 1015, 1017 (2d Cir. 1971) (per curiam). Otherwise, a defendant would have the unilateral benefit of an opportunity to revamp and change trial tactics.[112]

**110.** Post Hearing Memorandum in Support of Motion for New Trial, filed April 20, 1982, p. 3.

**111.** Movant makes broad allegations that he received ineffective assistance of counsel who did not call witnesses that defendant wished and could not devote full attention to the trial due to the untimely death of his father. *See* H.T. 515–18; Affidavit, Robert Blossner, Esq., verified November 12, 1981. However, this issue was raised on appeal and rejected by our Circuit Court of Appeals. *See* Appellant's Brief on Appeal, filed September 5, 1978, pp. 62–68; *United States v. Ochs, supra,* 595 F.2d at 1262. We also note that in addition to Mr. Blossner, Ochs was represented by Murray Appleman, Esq. who was responsible for the defense to the tax evasion charges.

**112.** In this regard, it is interesting to recall the remarks of movant's trial counsel in a discussion held outside the presence of the jury during the trial in 1978: "THE COURT: What does it look like? How many more witnesses do you have? ... MR. BLOSSNER: Judge, I have outside now three witnesses. Their testimony should take a total of nine minutes. I have one witness that was subpoenaed that never showed up. I believe as counsel in this case that I can get along without that one witness. I have reached a point where I am having a problem with my client. I was in my office until almost 10 o'clock last night interviewing witnesses. The witnesses that you have seen today are a portion of the total amount that were in my office. Other witnesses appeared here today which I didn't believe would aid my case, my client's case. I have reached a point where I am beginning to have difficulties with my client who believes that other witnesses should be called, and I think at this point, I should be frank with the Court, that as counsel in the case, I don't believe that they will benefit the case.... THE COURT: ... For the last 15 minutes Mr. Blossner has told me in the robing room that his client has other witnesses, witnesses that his client insists should be called to the stand. Well, it is an easy thing for a Judge to say, 'I'm sorry; you have had ample opportunity.' I didn't do it. Mr. Blossner says that these witnesses are suggested now by his client and that they are on top of the witnesses already examined and called to the stand. Be-

Both Marilyn Erskine and Stephen Napoli testified that they knew the defendant's wife, but that they had not been threatened or intimidated in any way by the prosecuting authorities. Further, both knew the defendant and had contact with him years before the trial. Nevertheless the record is barren, even by inference, as to why these witnesses were not called—witnesses who were allegedly armed with evidence vital to defendant's case. The due diligence imperative certainly is not met where defendant knew such potential witnesses before trial but failed to call them to testify for some unrevealed reason.

Particularly striking was the paucity of proof regarding Ochs' alleged children. Many of movant's witnesses boldly asserted that movant had children but could not give their names, ages and other details; some never mentioned Ochs' "children"; still others testified that the children did not belong to him.

· While we entertain no hesitancy whatever in declaring unworthy the total hearing testimony of the witnesses in support of the defendant's alleged marriage and children, had they been called to the stand at trial their testimony would have been admissible, leaving to the jury the weight to be given their testimony. We hear from them for the first time *nearly four years* after the jury returned its verdict, and not a word as to the reason for the lateness. This is a perfect illustration of the law's insistence on fair play by mandating clear, convincing proof of due diligence.

Movant has also failed to convince us that the proof advanced is anything more than cumulative and impeaching—if offered at trial, the jury could have considered its impact as it varied or added to what was already before it. Even assuming *arguendo* that the evidence offered by defendant was not merely cumulative and impeaching, we again reject it, for we found the hearing testimony on this issue unimpressive and far from convincing.

As to whether the proof advanced is "material," once again we are constrained to find the hearing testimony to be material to the extent covered hereinbefore with respect to the proof adduced on the issue of recantation. We emphasize that giving the proof adduced on the issue of materiality its most favorable application, it does not dissuade us from our ultimate conclusion that movant has utterly failed to meet the imperative the law imposes.

The proof adduced by the Government at trial overwhelmingly established Ochs guilty of claiming false exemptions for a non-existent wife and children. The jury had before it numerous stipulations regarding pertinent disclosures in Governmental records and work records of defendant, which revealed that Ochs was not married and had no children. The testimony of witnesses at trial was to the same effect. We are steadfast in our conclusion: The jury would not have been swayed from its ultimate conclusion. The "newly discovered" evidence could not jar an already clear and convincing picture.

It goes without saying that upon a review of the total record before us, the hearing evidence thereon would not have "probably produced an acquittal." [113]

---

cause I believe Mr. Blossner has been turning himself inside out with respect to this defense, and because he asks me to please give him an opportunity to see what it is his client is talking about when he suddenly says he has got more witnesses, I am going to allow Mr. Blossner additional time to decide whether or not to call those additional witnesses. But I want it done this evening." T.T. 1155–61.

**113.** It is clear that assuming prosecutorial misconduct exists, the "probability" test is inapplicable. "The intentional governmental suppression of evidence useful to the defense at trial will mandate a virtual automatic reversal of a criminal conviction. *See, e.g., Moore v. Illinois,* 408 U.S. 786, 797–98, 92 S.Ct. 2562, 2569–2570, 33 L.Ed.2d 706 (1972); *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *United States v. Sperling,* 506 F.2d 1323, 1333 (2d Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975)." *Stofsky, supra,* 527 F.2d at 243.

Put another way, "If it can be shown that the government deliberately suppressed the evidence, a new trial is warranted if ·the evidence

For all these reasons, we find totally unacceptable the hearing proof presented by defendant with respect to counts three through five.

### Official Misconduct

 Robin Ann Davis (Robin Ann Robison or Robinson) testified additionally at the hearing that an F.B.I. agent, assigned to the Ochs case and to whom Davis was supplying information as an informant, had sexual relations with her on numerous occasions. It was her testimony: [114]

Q. How was it that you knew Mr. Hurley?

A. From his investigation of George's case. . . .

Q. . . . When you had a meeting in the restaurant with Hurley and Jerry Schwartz, what was the nature of that discussion?

A. Well, it was in reference for Jerry to cooperate with them to give, you know, to work along with the DA in George's case.

Q. Did you have any other relationship with Mr. Hurley?

A. Yes, I did.

Q. What was the nature of that?

A. Are you getting to the intimate part?

Q. I am getting to whatever the relationship was. You tell the Court.

A. Well, on one occasion I was in Girlesque with Jerry, and Clark Hurley had called, and he asked Jerry to send up a girl to his apartment to give him a massage. And Jerry thought he was joking around. And then Jerry found out that he was serious. And Jerry says, 'Well, which girl do you want? You have been in here before'—because he was introduced to George Ochs as my brother. So Mr. Hurley said, 'I'd like to go with Robin.' And Jerry for a few—first, you know, he told him no. And then he realized that, you know, he was more worried about going to jail, I guess, than he was worried about me. So I had went to his apartment.

Q. Was that the only time you went to his apartment?

A. No.

Q. Could you give us your best approximation of the number of times?

A. At least twelve times.

Q. Did you receive any remuneration, that means money, from this man—. . .

A. Twice he gave me $200.

Q. What was your reason for engaging in this conduct with this man?

A. Because I thought it was—he made it quite clear that it was in Jerry's best interest that I cooperate with him.

Q. Did you consider sexual intercourse to be cooperation?

A. Yes, I did.

Q. Did he indicate that to you?

A. Yes, he did.

On cross-examination, Davis made positively clear that she did not know the date(s) when she allegedly had sexual relations with the F.B.I. agent or when she originally met that agent.[115]

On direct examination, Agent Hurley testified unequivocally to the nature and ex-

---

is merely material or favorable to the defense." *United States v. Kahn,* 472 F.2d 272, 287 (2d Cir. 1973).
On the other hand, "[the] inadvertent but negligent failure on the part of the prosecutor to furnish to the defense evidence in the prosecutor's control that is of an exculpatory or impeaching nature would loosen the standard of review relative to newly-discovered evidence and require a reversal if 'there was a significant chance that this added item. . . could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction.' *United States v. Seijo,* 514 F.2d 1357, 1364 (2d Cir. 1975); *United States v. Kahn,* 472 F.2d 272, 287

(2d Cir.), *cert. denied,* 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973); *United States v. Miller,* 411 F.2d at 825 (1969)." *Stofsky, supra,* 527 F.2d at 243.
However, in the present context we apply the "probability" test, for as indicated above, we find no instances of intentional governmental suppression of evidence or misconduct of any sort, and no "inadvertent but negligent" failure to disclose exculpatory evidence.

**114.** H.T. 129–33.

**115.** H.T. 171–78.

tent of his professional relationship with Davis: [116]

Q Could you give us your best approximation of how long a period of time that you had meetings or discussions with Robin Ann Robinson?

A From about mid-May of 1977 until around the latter part of 1978 or October, November, '78.

Q During that time period could you tell us what was the nature of your meetings with Robin Ann Robinson, as a general matter to start with.

A She was providing confidential information.

Q And during that time period was she paid on occasion for that information?

A Yes, she was, sir.

Q And giving us as approximately as accurately as you can, approximately how much money was she paid and on what dates? Do the best you can with that.

A She was paid $900 during that span. . . . I believe the first payment was in August of 1977 for $200. She was paid again in December of '77 for $250. She was paid in May of '78 for $200. And she was paid again in September of '78 for $250.

Q Now, did you meet with at any time Robin Ann Robinson alone in an apartment in New York?

A No, I did not, sir.

Q Did you at that time have an apartment yourself, agent, in New York?

A Yes, I did sir.

Q And did Robin Ann Robinson ever come to your apartment?

A Yes, she did.

Q Was she ever alone?

A No, she was not. . . .

Q Now, did you ever meet alone with Robin Ann Robinson at any time during the period you described for us?

A Yes, there were times where I did meet alone with her. . . . I don't remember the number of times. I did meet with her on the streets of New York in certain restaurants to talk with her and there were several occasions I met with her in my bureau car.

Q And at that time what was the nature of your relationship?

A The nature of my relationship was to obtain information from her.

Q And she was providing you information?

A Yes, she was, sir.

Q Now, did you at any time in any way receive any type of sexual favor or engage in sexual conduct with Robin Ann Robinson?

A No, I did not, sir.

Cross-examination of agent Hurley served only to bolster his steadfast denial of any tainted relationship with Davis: [117]

Q Do you have any unusual marks on your body?

A Yes, I do, sir.

Q Would Ms. Robinson, has Ms. Robinson ever seen your body?

A Other than dressed; that's the only way.

Q So what you are telling us is that on no occasion did Ms. Robinson ever see you undressed; is that right?

A That's right, sir.

Q Am I correct in saying you have an unusual mole on your body?

A No, you are not correct.

Q Do you have any kind of mark on your thigh?

A No, I do not, sir . . . .

Q When you were being interviewed in connection with this case concerning your testimony today, were you able to read the transcript of the proceeding?

A Yes, I was, sir.

Q Were you told—do you recollect in that transcript that Ms. Robinson indicated that you had some unusual mark on your body?

A I believe—I don't remember. I believe reading that, yes.

**116.** H.T. 633–35.

**117.** H.T. 644–45; 658–59.

Q Am I correct in saying that you did tell us that you had some unusual mark on your body?

A Yes, I do have.

Q Did you ever discuss that with her?

A With her? I believe I did.

Q So what you are telling us—could you tell us what that mark is?

A It's an appendix scar.

Q And you consider that to be an unusual mark, an appendix?

A That's the only mark on my body.

Q You have no birthmark, no mole, or anything below your belly button?

A No, I do not.

Davis' affidavit (verified December 14, 1981, ¶ 10) indicates that these relations occurred ". . . on at least five occasions." Further, her unsigned and unverified affidavit originally submitted (Memorandum in Support of Defendant's Motion for New Trial, filed November 12, 1981) states (at ¶ 10) that it was "Agent Percer" who had sexual relations with Davis. *See also* H.T. 162–66. Movant's attorney states that this error was entirely due to transcription problems encountered by his secretary. *See* Affidavit, Steven H. Gifis, Esq., verified June 17, 1982, ¶ 1. Finally, as part of his motion to reopen the record to submit further proof (which received no opposition), Ochs has offered, apparently for purposes of corroboration of Davis' testimony, the sworn statement of a private investigator (Affidavit, James J. Kingsley, verified March 5, 1982) who interviewed Davis about a month and a half after she testified at the instant hearing wherein he states in essence that on February 2, 1982 Davis told him that she had "sex" with agent Hurley "at least twenty to twenty five times" from the spring of 1977 to January, 1978.

\* \* \* \* \* \*

As to Davis' testimony on this score, we are compelled to denounce it as totally devoid of truth. Applying the test of credibility, we consider it along with the balance of

her total testimony and find it unconvincing. This particular phase of her testimony stands riddled with inconsistencies as to dates, times, places, distinguishing body features and other details. In sharp contrast was the forthright and credible testimony of agent Hurley.

As to the balance of the *Berry* factors, no purpose would be served by commenting on materiality, whether the evidence is merely cumulative and impeaching and whether it is of such a nature that upon retrial it will probably produce an acquittal. Suffice it to note that consideration of such factors do not dissuade us from our ultimate conclusion.

We go further: Movant concedes that "Davis was certain that this conduct [i.e. sexual relations] occurred before the trial." Post Hearing Memorandum in Support of New Trial, dated April 6, 1982, p. 7. It is inconceivable that due diligence could not have produced this testimony. After all, movant and Jerry Schwartz (Davis' alleged paramour) were business partners. In fact, Davis testified that she appeared at Ochs' trial at defense counsel's request (See H.T. 128). The bold and erroneous assertion that this proof is in any way "new" or could not have been discovered through the exercise of due diligence falls flat in light of the reality of the circumstances then existing. Put another way, "[t]he failure to obtain and exploit the impeaching data until after the jury had rendered its verdict offers strong support for the . . . contention that the defense did not exercise due diligence in obtaining the . . . impeaching evidence in time for use at trial." *United States v. Stofsky,* 527 F.2d 237, 245 (2d Cir. 1975).

### The Due Process Claim

Ochs also argues that his due process rights were violated by governmental intimidation of witnesses in possession of exculpatory evidence as well as by use of perjurious testimony.[118] *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330

---

**118.** Post Hearing Memorandum in Support of Motion for New Trial, dated April 6, 1982, pp. 18–25.

(1972); *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *Berger v. United States,* 295 U.S. 78, 84, 55 S.Ct. 629, 631, 79 L.Ed. 1314 (1935).[119] These arguments are totally baseless. As we have repeatedly emphasized throughout this opinion, there is an utter failure of proof on the key factual issues underpinning such claims.

We do not find that the Government used perjurious testimony. We do not find the Government engaged in any intimidation tactics. It must be remembered that:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. *He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.*

*Berger, supra,* 295 U.S. at 88, 55 S.Ct. at 633 (emphasis ours).

Any truth-seeking mission demands no less. It is not a game of semantics where the astutely articulate prevails. The Government through its authorized representatives is given enormous power in the prosecution of criminal cases. It must

search deep and wide in order that truth emerge for presentation before the trier of fact. This, like any goal worthy of its efforts, often demands more than affable and fraternal approaches. It demands hammer blows without which the doing of justice would succumb to less prized values.

This is not to say that there are not instances where misguided intentions inappropriately impinge on a defendant's cherished constitutional or other statutory rights. *See, e.g., Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Webb, supra; United States v. Morrison,* 535 F.2d 223 (2d Cir. 1976). Rather and only that most emphatically this is not such a case.

Many of the witnesses with whom the prosecution had to deal evidently took great liberties with the truth. To learn from them the extent of defendant's multifarious practices demanded firm and tough questioning, especially where truth was buried in their personal motives, fear and anti-social commitment. To conclude that direct and penetrating investigative techniques were unnecessary to break the solid barriers so often erected by such witnesses simply would be unrealistic. The prosecution did, and indeed was obliged to, use all *legitimate* techniques to the end that justice—for the community and defendant alike—prevail. Nothing before us credibly indicates that legitimate techniques were not exclusively applied throughout the investigation and prosecution of this criminal enterprise, despite the extensive opportunities we accorded defendant to come forward with acceptable proof to the contrary (See also fn. 2).[120]

---

**119.** *See also,* Clinton, *The Right to Present A Defense: An Emergent Constitutional Guarantee in Criminal Trials,* 9 Ind.L.Rev. 711, 848 (1976): "Although the *Webb* case dealt only with judicial admonitions..., other cases hold that prosecutorial efforts to harass or discourage defense witnesses also constitute a denial of the right to present a defense. Such prosecutorial efforts have been known to include not only perjury admonitions, but also direct threats of prosecution or arrest for testifying for the defense. Of course, the right guaran-

teed the accused is not violated merely because the court or prosecutor has interjected a single discouraging comment. The cases properly suggest that the accused must demonstrate that he was in fact denied the witness' testimony or that the witness changed his testimony as a result of harassment or discouragement."

**120.** Indeed, the flood of material offered by Ochs began in early November, 1981 and has continued throughout June, 1982.

Then, too, we must bear in mind that defendant's serious criminal record (likewise true of many of his witnesses at the hearing) strongly indicates asocial, criminal tendencies which include false swearing encouraged by a desperate attempt to extricate himself from incarceration.[121]

### Conclusion

We are well aware of the sensitive and meticulous approach constituting part of the burden which a motion for a new trial imposes on the fact finder. We have considered and analyzed with great care every piece of evidence adduced for its particular effect and its cumulative impact on every phase of movant's instant application. On the proof adduced at the hearing and on the law applicable thereto, no alternative exists—we must deny the relief he now seeks. In sum, we are compelled to disclose that on this application for a new trial, the total proof adduced at the hearing in support of alleged newly discovered evidence is hollow, devoid of merit, unconvincing. It falls far short of meeting the requisite indispensable test of satisfactory proof.

The court order now sought by defendant must not issue "except for the most extraordinary circumstances" and exercised "only with great caution."[122]

As to the law which mandates the prescription which must be filled with exactitude before a court may entertain such an application for relief, the total hearing record is either silent, cast aside, ignored, or at the very least exceedingly and fatally thin: The law demands a convincing demonstration particularly of due diligence; credible proof that in fact the proffered evidence is new; a persuasive showing that the evidence is not merely cumulative and impeaching; convincing proof of intentional governmental suppression of evidence or other inexcusable impropriety; much more than the mere assertion that his attorney was to blame. Briefly, his proof did not

sustain any one of the many grounds he advances for our intervention. He failed completely to show that the evidence presented is "of such a nature that upon retrial, it will probably produce an acquittal."[123]

As we see it, the verdict of the jury rendered on February 6, 1978 remains undisturbed. It was predicated on a factual presentation and the law applicable thereto at trial which, on appeal, our Circuit Court on March 13, 1979 found firmly established:

> ...The Government's proof at...trial...sufficiently demonstrated that during the years 1974 through 1976 Ochs owned and operated a New York City massage parlor and conducted a loansharking business and that in the course of his loansharking activities Ochs threatened to murder Debbie Frank McElroy, a prostitute whom he employed at his Studio One massage parlor, for failure to make interest payments on a usurious loan. The evidence further revealed several violations of the federal income tax laws. On his 1971, 1972 and 1973 tax returns Ochs claimed false exemptions for a non-existent wife and several children, and in 1974 Ochs received $25,000 in income from his prostitution and loansharking business which he did not report; indeed Ochs filed no tax return for 1974. Finally, while Ochs was being investigated by a federal grand jury sitting in the Southern District of New York, he approached witnesses who were subpoenaed to appear before the grand jury and instructed them to lie when questioned about payments of interest made on loans. Ochs instructed the witnesses in the alternative to refuse to testify before the grand jury by asserting their Fifth Amendment privilege....

*Ochs, supra,* 595 F.2d at 1251.

Our Circuit Court did not stop there:

> We are not disposed to use this case to test the limits of our power with respect

---

**121.** *See, e.g., United States v. Unterman,* 422 F.Supp. 228 (S.D.N.Y.1976); *United States v. McClain,* 527 F.Supp. 209 (S.D.N.Y.1981).

**122.** *Fassoulis, supra,* 203 F.Supp. at 117; *Alessi, supra,* 638 F.2d at 479.

**123.** *Fassoulis, supra,* 203 F.Supp. at 117.

to sentences that are within legal limits and are not shown to have been based upon materially inaccurate information. Judge Cooper was dealing not with a man who had simply yielded to the temptation to cheat the Government of income taxes by claiming false exemptions but with an individual whose whole life from the age of 16 to his then age of 48 had shown a contemptuous disregard for law. After serving jail sentences and being released on parole, he repeatedly violated parole by committing new crimes. On the undisputed record disclosed in the pre-sentence report, the judge could reasonably have given Ochs an even higher total sentence than he did. Particularly in light of our disposition of the suppression claim, we are not concerned with how the sentence was structured.

*Id.* at 1262.

As we see it, the defendant has had the fair trial to which he was fully entitled. His appeals firmly established that. Each of his post-verdict applications up to the instant one resulted adversely to him; the appeals therefrom left our orders thereon undisturbed. We have now determined that his instant motion is devoid of merit. With justifiable pride, we applaud our legal system which endorses and makes possible the unrestricted opportunities accorded the defendant to challenge the criminal charges lodged against him. He has had his day in court.

Accordingly, we are constrained to, and do, deny the application in all respects.

SO ORDERED.